615 So.2d 1375 (1993)
James D. WEAVER, Plaintiff-Appellant,
v.
VALLEY ELECTRIC MEMBERSHIP CORP., Defendant-Appellee.
No. 24261-CA.
Court of Appeal of Louisiana, Second Circuit.
March 31, 1993.
*1378 Charles W. Seaman, Natchitoches, Perry Tanner, Livingston, TX, for plaintiff-appellant James Weaver.
Hicks & Hubley by Michael S. Hubley, Shreveport, Stan Nix, Kingwood, TX, for intervenor Commercial Union Ins. Co.
Lunn, Irion, Johnson, Salley & Carlisle by Brian D. Smith, Shreveport, for defendant-appellee.
Before MARVIN, C.J., and NORRIS, LINDSAY, VICTORY and STEWART, JJ.
MARVIN, Chief Judge.
As mandated by LSA-Const. Art. 5, § 8 B, this appeal was submitted to a five-judge panel on reargument after one judge of the three-judge panel that heard the appeal dissented to the reversal of the judgment of the trial court.
The appeal is by a farm laborer, James Weaver, who sustained electrical shock injuries in the course and scope of his employment, and by his employer's w.c. insurer, who paid his medical expenses and weekly compensation. After jury trial, the judgment rejected their demands against the power company whose lower transmission line snagged or hung on the top of a cotton picker being driven on a public road. Weaver was injured while attempting to release the wire which hung lower than minimum height suggested by industry safety standards.
The judgment was based on the jury's answers to interrogatories which first declared that the defendant power company, VEMCO, was negligent, but secondly and on the other hand, that VEMCO's negligence was not a "legal cause" of the accident. The trial court denied JNOV and a new trial.
We reverse and render judgment, allocating fault and awarding damages.
The C.C. Arts. 2315-16 standard of care of the transmitter of high voltage electricity is concisely stated in F. Stone, 12 Louisiana Civil Law TreatiseTort Doctrine, § 395 (1977). The standard is jurisprudentially derived from Dobson v. Louisiana Power & Light Co., 567 So.2d 569 (La. 1990); Levi v. S.W. La. Elec. Membership Co-op., 542 So.2d 1081 (La.1989); Hebert v. Gulf States Utilities Co., 426 So.2d 111 (La.1983); Kent v. Gulf States Utilities Co., 418 So.2d 493 (La.1982). See also Horton v. Valley Electric Membership Corporation, 461 So.2d 375 (La.App.2d Cir.1984); Simon v. Southwest Louisiana Electric Membership Corp., 390 So.2d 1265 (La. 1980).

THE JURY'S CONCLUSIONS
The picker was 15'9" high, a legally permissible height under LRS 32:385 and a height lower than the 16-foot minimum height suggested by The National Electric Safety Code in effect when the 1988 accident occurred.
In this area of DeSoto Parish, VEMCO's line consisted of two wires, the lower being the "neutral" conductor which was about two feet below the upper high voltage conductor. Weaver was injured when he somehow contacted or grasped the upper wire after climbing atop the picker and attempting to release the lower wire that had snagged the picker.
*1379 The record and the law support the jury's conclusion that VEMCO was negligent in that its failure to maintain its lines at a reasonably safe height breached a legal duty owed to Weaver and caused his injuries. Negligence, by definition, is conduct which breaches a legal duty owed by a defendant to a plaintiff and causes in fact injury to plaintiff. See F. Stone, supra.
The jury's second conclusion that VEMCO's negligence was not the legal "cause" of the accident is erroneous and directly contrary to its first conclusion. The second conclusion implies either that VEMCO did not breach a legal duty it owed to Weaver that caused him injury or that VEMCO's negligence is somehow "excused," perhaps by Weaver's "concurrent" or "later" negligence. The record does not allow the conclusion that Weaver intentionally grabbed the upper wire while attempting to release the snagged wire, notwithstanding this suggestion by VEMCO's expert.
Having protected against the risk of contact with VEMCO transmission lines by escorting the 15'9" high cotton picker from Natchitoches to the DeSoto Parish cotton plantation a month before the cotton picking season began, VEMCO knew that the picker would be operating beneath VEMCO lines on that plantation. VEMCO's obligation to maintain its lines above the height of the picker on that plantation is easily associated with the particular and reasonably foreseeable risk that a laborer on that plantation would suffer electrical injury by climbing atop the picker and attempting, however imprudently, to release a low-hanging transmission line that snagged or hung on the picker. Dobson, supra.
Disassociating VEMCO's obligation from that particular and foreseeable risk would require us to ignore the holdings of the cases cited supra and to conclude that VEMCO's failure to meet its legal obligation to maintain the wire at a reasonably safe height under the circumstances did not constitute negligence. See Malone, Ruminations on Cause-In-Fact, 9 Stan. L.Rev. 60 (1956); Robertson, Reason Versus Rule In Louisiana Tort Law: Dialogues On Hill v. Lundin & Associates, Inc., 34 La.L.Rev. 1 (1973); Stone, supra.
Applying negligence standards, we analyze VEMCO's conduct and the legal standard of care to which VEMCO is subjected.

OTHER FACTS
The accident occurred about 2:00 p.m. on September 9, 1988, on a rural two-lane paved public road in DeSoto Parish that was traversed overhead by VEMCO's transmission line. Weaver, then 40 years old, had been employed for about a year as a laborer on a 700-acre cotton plantation owned by Stan McMullin and his father.
The particular risk that this low-hanging VEMCO line would contact this cotton picker or other high implements used on the McMullin plantation was known by VEMCO's employees in the area and by McMullin and Weaver. These persons also knew that overhead transmission lines, during the heat of the day, expand and "sag" lower toward the ground. Weaver testified he knew before the accident of the danger of high voltage electricity and that he should avoid any contact with the upper, or high voltage, line.
To protect against the risk of contact with VEMCO lines, VEMCO employees had "escorted" the 15'9" cotton picker from Natchitoches to the McMullin plantation when the picker was delivered there by McMullin's vendor about a month before the accident. VEMCO employees had sometimes assisted McMullin and other farmers to facilitate the movement of farm equipment around and under VEMCO lines traversing parish roads in the area.
About 9:00 a.m. three days before the accident and to a McMullin cotton field about a mile away from the accident scene, McMullin, accompanied by Weaver, drove the 15'9" cotton picker on the public road under the transmission line in question, clearing the bottom wire by an estimated three to four inches. The McMullins had a 16' PVC pipe and neoprene gloves which either Weaver or Stan McMullin, in Weaver's presence, later used to facilitate entry of the picker under a VEMCO overhead *1380 line and into this first cotton field in which the picker operated.
When that first field had been picked, McMullin, accompanied by Weaver, drove the cotton picker on the same public road toward a second McMullin cotton field. The PVC pipe was inadvertently left at the first field.
Following McMullin and Weaver in his pickup truck on the afternoon of the accident was Millard Kimball, an agriculture research associate for LSU Red River Experiment Station. Kimball had been observing the operation of the picker in the first field.
As the picker approached VEMCO's overhead line, Weaver, remembering the 3-4" close clearance on the trip to the first field, departed the picker to monitor the clearance. Similarly remembering and driving slowly, McMullin stopped the picker when he saw in the picker's rearview mirrors that the lower line had snagged or hung on the picker.
Wearing the neoprene gloves, Weaver climbed atop the stopped picker to release the wire. Observing this and stopping his pickup behind the stopped picker, Kimball walked to the picker to converse with McMullin. Neither was in a position to see exactly what Weaver was doing atop the picker or how or why he contacted the upper high voltage wire. Both heard the noise of the electrical contact ("buzzing," "sizzling," "real loud humming"). Kimball looked up to see Weaver "landing" on his back atop the picker.
At Kimball's suggestion and to gain more distance from the danger and allow safer access to Weaver, McMullin deliberately drove the picker about 50 feet forward, breaking the snagged bottom wire. McMullin and Kimball then removed Weaver, who was unconscious, transporting him to the Coushatta hospital. McMullin noticed that the glove on Weaver's left hand was "charred." Hospital records also noted "entrance" burns in Weaver's left hand and "exit" burns on Weaver's feet.
The trauma affected Weaver's memory. His testimony to this effect was corroborated by medical experts. Weaver testified that he did not remember the day or any details of the accident or his being deposed six months later about the accident. Weaver testified that before the accident he knew about the danger of high voltage electricity, that he knew the upper wire was the energized wire which he should avoid, and that he "respected" electricity and would not have intentionally grasped or grabbed the upper wire.
We agree that Weaver's gloved left hand contacted or grasped the upper high voltage wire that caused his electrical burns and resulting injuries, but we cannot presume or find on this record that Weaver intentionally grabbed the upper wire, knowing and "respecting" the danger it posed. In an ordinary negligence action, there is no presumption of negligence on either plaintiff or defendant. The party asserting the negligence of another has the burden of proving it in the ordinary case. Bergeron v. K-Mart Corp., 540 So.2d 406 (La.App. 1st Cir.1989), writ denied. Compare Stansbury v. Mayor and Councilmen of Morgan City, 84 So.2d 445 (La. 1955); Lejeune v. State, Department of Highways, 215 So.2d 150 (La.App. 3d Cir. 1968), writ denied.

PARTIAL SUMMARY JUDGMENT; CAUSE OF ACTION
Before the trial on the merits, the trial court granted VEMCO's motion for partial summary judgment to preclude Weaver's demand under C.C. Art. 2315.3 for exemplary or punitive damages that are caused by a "hazardous or toxic substance." Weaver's first assignment attacks that summary judgment, the basis for which is the trial court's determination that electricity was not within the meaning of a "hazardous or toxic substance" as that phrase was employed in Art. 2315.3 before the article was amended in 1990 to expressly exclude electricity.
The trial court correctly ruled. Art. 2315.3 was and is an exception to the general rule of law in Louisiana which allows recovery only for actual damages. A statute allowing, in appropriate circumstances, *1381 the further award of exemplary or punitive damages, being penal in nature, must be strictly construed by the courts. American Waste & Pollution v. Madison Parish, 488 So.2d 940 (La.1986). See also Vincent v. Southwest La. Elec. Membership Corp., 666 F.Supp 94 (W.D.La.1987).
Even before the amendment to Art. 2315.3, Louisiana had not found the transmission of electricity to be within the category of things or activities such as pile driving, storage of toxic gas, blasting with explosives and aero-crop dusting, which, regardless of protective measures, impose a "high degree of risk" and warrant the imposition of absolute liability and punitive damages. Kent, supra. See also Hebert, supra; Levi, supra.
Indeed, the cause of action for electrical injury or electrocution from contact with an overhead transmission line is one based on substandard conduct or C.C. Arts. 2315-16 negligence and not on the absolute liability contemplated by Art. 2315.3 or the "strict" liability of Art. 2317. Hebert, supra; Levi, supra. When the transmission of electricity results in injury, it is almost always because of substandard conduct on the part of either or both the utility and the victim. See Dobson, supra; Kent, supra; Hebert, supra; Levi, supra.
Where a person or thing negligently contacts an overhead electrical transmission line,
The crucial questions are (a) whether the power company was required to recognize that its conduct involved a risk of causing physical injury or loss to another in the manner of that sustained by the plaintiff, and, if so, whether the possibility of such injury or loss constituted an unreasonable risk of harm. These issues are decided under either a duty-risk or a traditional negligence approach.... The legal duty under one approach and the standard of conduct under the other impose the same obligation ... Levi, supra, 542 So.2d at 1083.
Louisiana exacts a high degree of care from those who deal in the manufacture and distribution of electricity due to the high risk involved, but the cases have been brought under article 2316 requiring proof of negligence, rather than under article 2317 imposing strict liability.
A presumption of foreseeability through constructive knowledge of the risk of an electrical hazard existing for a reasonable time has made the negligence standard of "utmost care" virtually indistinguishable from strict liability. While the Louisiana Supreme Court has stated that the reasonable care of the company is to be considered after the hazard is classified as an "unreasonable risk," this is analytically difficult, if not impossible, because an unreasonable risk by definition arises only from a failure to use reasonable care. F. Stone, supra, § 395 (W. Crawford, Supp.1992), discussing Levi.

VEMCO's duty as a transmitter of high-voltage electricity has been said to be "three-fold:" (1) to insulate the lines (either actually or by reasonable "isolation"), or (2) to warn adequately of the danger, or (3) to take other proper and reasonable precaution to prevent [reasonably foreseeable] injury. Horton, supra, at 378.

CAUSE-IN-FACT VS. LEGAL "CAUSE"
The cause-in-fact issue relates solely to conduct, an act or omission that results in harm or damage to another. Conduct is a cause-in-fact of a harm if it was "a substantial factor in bringing about this harm." Dixie Drive It Yourself Sys. v. American Beverage Co., 137 So.2d 298, 302 (La.1962). This is a "but for" inquiry into the logical consequences of conduct and not into the absurd extremes. The cause-in-fact inquiry (totally factual) is entirely different from the scope or extent of legal duty inquiry, the proximate, and now, legal "cause" issue. "Cause" in legal cause or proximate cause is a misnomer because the scope of duty inquiry is actually an inquiry into whether a legal standard of care exists and into policies for and against extending the asserted legal standard of care to protect the particular plaintiff against the particular harm. Malone, supra; Robertson, supra.
*1382 VEMCO's argument, capsulized, is that Weaver, McMullin and Millard Kimball, after the picker snagged the wire, had multiple "options" available to them to prevent the "unfortunate accident" which would not have happened "but for" their failure to utilize these options. VEMCO seizes on language in several cases to the effect that a defendant's conduct should not be found to be a "legal cause" of the harm that befalls a plaintiff unless a "substantial relationship" exists between that defendant's conduct or omission and the harm that plaintiff suffers. See e.g., Fowler v. State Farm Fire & Casualty Ins. Co., 485 So.2d 168 (La.App. 2d Cir.1986), writ denied; Nichols v. Nichols, 556 So.2d 876 (La.App. 2d Cir.1990). Weaver couches his argument in somewhat similar terms.
The substantiality of the relationship or association of conduct to the harm that resulted (also sometimes stated as "but for this conduct, this harm would not have resulted"), is the first or threshold inquiry in a negligence action. If a defendant's conduct is not found to be a cause-in-fact of the plaintiff's injury, further inquiry into, or analysis of, whether any duty imposed by law on the defendant extends to protect this plaintiff against the harm he suffered is unnecessary. Malone, supra; F. Stone, supra; Robertson, supra.
Here we have no difficulty with the factual inquiry and conclusion of the jury. VEMCO's failure to maintain its bottom neutral conductor line at a height above the 15'9" known height of the cotton picker was substantially related to, and was a cause-in-fact of, the harm that befell Weaver. It is also logical and not absurd to conclude that but for the failure of VEMCO to maintain the line at the minimal 16' height, at which the line hung even three days before the accident when the picker was first driven under it, Weaver would not have suffered the harm.
VEMCO's conduct or failure is not enervated as a cause-in-fact simply because Weaver's conduct, however imprudent, was a response to VEMCO's failure and was also a cause-in-fact of the harm that befell him. This accident, like others, had more than one cause-in-fact.
Our approval of the jury's conclusion on cause-in-fact does not automatically resolve whether VEMCO's conduct was negligent or substandard or whether there are policy reasons that excuse extending VEMCO's duty to protect a negligent plaintiff such as Weaver from the particular harm. These legal standard of care, or legal "cause," issues are hereafter discussed.

NEGLIGENCE DOCTRINES COMPARED
Under the former contributory negligence bar, there was no need for courts to dwell upon whether the conduct of a plaintiff in a negligence action constituted either or both assumption of risk and contributory negligence. The result under either approach barred a plaintiff's recovery.
After the adoption of comparative negligence, a plaintiff who negligently conducts himself in the face of even obvious and great danger from high voltage transmission lines is not barred from recovering from a transmitter whose negligent conduct is a cause-in-fact of that plaintiff's injury. Dobson, supra.
Otherwise in all cases of obvious and great danger, the courts would conclude that the plaintiff does not recover simply because of the obviousness and gravity of the risk to which he exposes himself. Under the comparative negligence regime, assumption of the risk does not survive in Louisiana as a distinct legal concept for any purpose. "[T]he courts, lawyers and litigants would best be served by no longer utilizing the term ..." Murray v. Ramada Inns, Inc., 521 So.2d 1123 (La.1988).

VEMCO's DUTY?
We paraphrase Levi, supra, to state a power company's duty with respect to its overhead transmission lines: If a reasonable person, exercising his or her perception, attention, memory, knowledge and experience, would or should reasonably recognize that overhead transmission lines *1383 pose to him or her a risk of harm [that is unreasonable], a power company, practicing electrical safety and thereby possessing equal or superior qualities, is legally required to recognize that particular risk of harm. This duty exists on the part of a knowledgeable power company in some circumstances even though the height of the overhead transmission line exceeds industry safety distance or height standards, as in Levi. The standard to which the power company is held in such circumstances becomes that of a reasonable person with superior attributes. Levi, supra, 542 So.2d at 1084.
Mere compliance with safety standards does not, per se, relieve the utility of negligence. Simon, supra; Levi, supra. When the insulation, height, distance and other safety attributes of transmission lines are considered in the light of developmental factors (population and building density and use of land and structures), even though these factors are not attributable, but are, or should be known, to the utility, the utility can no longer fulfill its duty by maintaining the status quo of protective measures which may have been deemed before development to be legally sufficient to avoid accidents at the work place. The utility's duty is to take reasonable measures to assure that workers legitimately in the area are able to work without an unreasonable risk of harm from high voltage transmission lines. Hebert, supra, at 116 (who had actual knowledge of risk); and Levi, supra, at 1085-86 (who had constructive knowledge of risk).
Here, VEMCO and Weaver had actual knowledge of the particular risk that the 15'9" cotton picker would be operating underneath its lines on the 700-acre plantation.
VEMCO's specific duty was to reasonably protect against the possibility that this 15'9" cotton picker would contact an overhead VEMCO transmission line and thereby pose a risk of injury to a farm laborer who might attempt, however imprudently, to release or eliminate that contact. Dobson, supra; Levi, supra; F. Stone, supra.
In some instances a risk may not be found within the scope of an electrical utility's duty where the circumstances of that particular injury to that plaintiff could not be reasonably foreseen or anticipated, "because there was no ease of association between that risk" and the utility's legal duty. See Hebert, supra, at 114, discussing Simon and Kent, supra, citing Hill v. Lundin & Associates, Inc., 256 So.2d 620 (La. 1972).
We are cautioned that foreseeability, as the determining test, is neither always reliable nor the only criterion for comparing the relationship between a duty and a risk. Some foreseeable risks that arise because of a defendant's conduct are not within the scope of the duty owed to a particular plaintiff because of that plaintiff's circumstances. Neither are all risks excluded simply because they are unforeseeable. The ease of association of the injury with the rule of conduct that is urged, however, is the proper inquiry. See W. Prosser, Law of Torts (3d Ed.1964) at 282 ff; Robertson, supra. The extent of protection owed a particular plaintiff is determined on a case-to-case basis to avoid making a defendant an "insurer" of all persons against all harms. Malone, Ruminations on Dixie Drive It Yourself Versus American Beverage Company, 30 La. L.Rev. 363 (1970); Robertson, supra. See Entrevia v. Hood, 427 So.2d 1146 (La. 1983); Peacock's Inc. v. Shreveport Alarm Co., 510 So.2d 387 (La.App. 2d Cir.1987), writs denied.
In cases where the scope of a utility's protection against a particular risk posed by an overhead high voltage line is in question, Levi, supra, has suggested yet an additional analysis of whether the risk is "unreasonable." This analysis, in our opinion, is akin to the traditional inquiry into legal, social and economic policies that might negate associating the risk with the duty, thus precluding a finding of negligence or the protection of the asserted "duty."
Notwithstanding Professor Crawford's comments at F. Stone, § 395 pocket part, *1384 quoted supra, we nonetheless make the Levi analysis whether the particular risk of contact between the line and the machinery, which here, as in Levi, supra, was known both to the power company and the plaintiff, and was an "unreasonable risk."
Following the analysis in Dobson, supra, and in Levi, supra, we "weigh" the precautions "demanded of" VEMCO by three factors: the possibility contact will occur and cause electricity to escape; the gravity or seriousness of the injury that likely will occur; and the burden of the precautions necessary to avert that particular risk. See Levi, supra, 542 So.2d at 1086-87; Dobson, supra, 567 So.2d at 575 (citations omitted). When the product of the possibility of escape of high voltage electricity, multiplied times the gravity of the likely harm, exceeds the burden of precautions, the failure to take those precautions is negligence. Levi, supra, at 1086-87.

VEMCO'S "LEGAL CAUSE" ARGUMENT
VEMCO asserts several ways that the cotton picker's contact with the low wire could have been released more easily and safely (seven or nine options available to McMullins and Weaver).
We emphasize that VEMCO's argument, in some detail, is that because Weaver voluntarily placed himself in a situation with full knowledge of the danger involved, the accident did not occur out of any unreasonable risk of harm created by VEMCO; that there was no threat of injury from the lower neutral conductor until Weaver chose to climb atop the picker and attempt to unsnag the lower wire and then grasped that wire; that the unfortunate accident was caused solely by Weaver's reckless disregard for his own safety and not by an unreasonable risk of harm created by VEMCO; and that the risk created by Weaver's conduct was not within the scope of VEMCO'S duty even though VEMCO might have been "negligent" in allowing this line to be within 15'9" of the road.
Continuing its suggestion that both "cause"-in-fact and legal "cause" are "factual" issues which neither we nor the trial court should disturb, VEMCO asserts that the "one thing ... apparent" from the jury's answers to two verdict interrogatories is that the jury was of the impression that VEMCO's negligence "was not more substantial than any other party's [but] was merely one of a number of possible substantial factors [such as] the plaintiff grabbing, pushing, or lifting [the energized primary wire] with his left hand."
VEMCO's argument overlooks that a plaintiff's negligence in the face of high voltage electricity does not totally excuse, abate or enervate negligent conduct of the utility transmitting that electricity. Dobson, supra; C.C. Art. 2323.
Moreover, the suggestion that VEMCO's negligence is somehow legally subsumed by Weaver's alleged greater negligence is nothing more than an assertion either that Weaver was 100 percent at fault or that he assumed the risk of the harm that befell him by climbing atop the cotton picker in the face of the known danger after the picker snagged the lower wire. Weaver's negligent conduct is not a legitimate, or a "policy," reason that excuses VEMCO's negligence. In such cases, "the claim for damages shall not be defeated, but the amount of damages recoverable shall be reduced in proportion to the degree or percentage of negligence attributable to the person suffering the injury ..." C.C. Art. 2323.
When both the defendant and plaintiff are found negligent, the substantiality of the respective conduct of each, as a cause-in-fact of the harm, may again come into play as a factor in comparing and allocating percentages of fault as directed by Art. 2323.

DUTY OF HIGH-VOLTAGE TRANSMITTER TO THE OCCASIONALLY NEGLIGENT PLAINTIFF
The standard of care owed by the transmitter of high voltage electricity includes precaution or protection against the "occasional negligence" that is ordinary *1385 and reasonably anticipated in humankind. Even more so than the ordinary reasonable person, a power company is required to recognize and make reparation for a risk that takes effect through another's foreseeable negligence. It is not due care for the transmitter of high voltage electricity, who is charged with protecting and practicing electrical safety measures against the risk of injury from contact by another with transmission lines, to rely on another to exercise due care for his or her own protection when the transmitter has superior knowledge of the danger of high voltage and greater experience with electrical safety measures that should be employed. Levi, supra, 542 So.2d at 1086 (citations omitted).
In situations where the transmitter of high voltage electricity is found negligent, comparative negligence principles apply to a plaintiff who is or should be aware of the danger or risk, however great, the plaintiff's awareness being "among the factors to be considered in assessing percentages of fault." Dobson, supra. See also Murray, supra, at 1134.

POLICY INQUIRIES "EXCUSING" NEGLIGENCE?
What is the purpose of recognizing and enforcing, by law, a standard that a transmitter of high voltage electricity must maintain its uninsulated lines at a distance or height that would protect against contact by some persons or things in some situations of which the transmitter has knowledge, actual or constructive? Is this plaintiff, in the circumstances under which the harm that befell him, such a person contemplated for protection under that standard? Are there reasons of policy, whether social, legal, or economic, that a court, exercising legislative-like insight, should recognize that will "excuse" application of the standard to protect this plaintiff in this particular circumstance? Would the standard be rendered legally sterile if not enforced in the instant circumstance? See Robertson, supra.
We shall discuss the economic inquiry, the others, being, in our opinion, pregnant questions or, having been answered in the cases we have cited and quoted.
The economic inquiry, which we deem is the Levi third factor for determining whether the risk to be protected against is an "unreasonable" risk, may negate imposition of the duty that is urged (the finding of negligence) in some circumstances. The burden of the precautions necessary to protect against some risks may be too great to impose on a particular defendant and thus may afford reason to dis associate the duty from the particular risk. This burden is analytically "balanced" on the scales of justice by weighing policy reasons against the specific risk. Again careful analysis is required in this area. See Levi, supra; Malone, supra, 30 La.L.Rev. 363; Robertson, supra. See discussion in Entrevia v. Hood, supra.
The law imposes liability for the failure to take precautions if the cost of precaution is relatively low. Levi, supra, at 1086-87. The transmitter's obligation of the "utmost," a "high degree," or "reasonable," care is to exercise that care "as far as practicable," a recognition that not all plaintiffs in all circumstances are protected against all risks from the escape of high voltage electricity. Levi, supra, at 1084. Compare Kent, supra.
VEMCO asserts that it maintains almost 6,500 miles of transmission lines with more than 90,000 spans of lines between its utility poles which it "inspects," through hired independent inspectors, every 5-10 years. VEMCO also emphasizes that its employees who maintain its system and answer service calls are instructed to look for and report "dangers" observed in the system. VEMCO customers are also requested to report defects or malfunctions. We shall not pass on VEMCO's argument that its inspection procedures for its entire system (averaging an inspection once every eight years) should be deemed legally and economically "adequate" or reasonable so as to comply with the inspection standard pronounced in the cited cases, particularly Levi, supra, and Horton, supra.
The purpose of the reasonable inspection obligation is simply to facilitate discovery *1386 and remedy of risks and defects that arise in the system. Spillars v. Louisiana Power & Light Co., 49 So.2d 474 (La.App. 2d Cir.1950); Scott v. Claiborne Electric Cooperative, 13 So.2d 524 (La.App. 2d Cir. 1943) (emphasis supplied).
We consider VEMCO's obligation to remedy only the specific risk, which was known to VEMCO, that the 15'9" high picker would be driven under VEMCO lines on the 700-acre McMullin plantation during cotton picking season. VEMCO has not shown or suggested that it would have been unduly burdensome or costly for VEMCO employees to have visibly inspected its lines on the plantation within a reasonable time after its employees accompanied the delivery of the picker to that plantation.

CONCLUSION ON NEGLIGENCE ISSUES
We find no economic or other policy reason excusing VEMCO's failure to maintain this transmission line on the 700-acre cotton plantation above the 15'9" height of the cotton picker. The jury's verdict finding VEMCO negligent is a conclusion that VEMCO's conduct was substandard, a breach of its legal duty, which caused in fact the harm that befell Weaver. This conclusion is factually supported by the record and is not legally erroneous.
The jury's verdict and the trial court's ruling on the legal "cause" issue were wrong either in the implied conclusion that VEMCO's duty did not extend to protect Weaver from the injuries he sustained under the particular circumstances or in the implied conclusion that VEMCO's duty was somehow excused or subsumed by Weaver's negligence. VEMCO's failure to maintain its line above the 15'9" height of the picker breached the legal standard of care it owed Weaver and was negligent conduct.
We shall compare VEMCO's negligence with Weaver's negligence, allocating the respective percentages of fault, and assess Weaver's damages. C.C. Art. 2323; Morris v. Owens-Illinois, Inc., 582 So.2d 1349 (La.App. 2d Cir.1991), writ denied.

WEAVER'S NEGLIGENCE
Notwithstanding the result and the rationale in several of the pre-comparative negligence cases, each of which usually found only one litigant negligent in electrocution or electrical injury cases, the negligence question here presented affects both Weaver and VEMCO. Conversely, VEMCO's negligence does not negate Weaver's duty to conform to the standard of care that would be exercised by a reasonable person knowingly working closely to uninsulated high voltage lines. Dobson, supra.
Weaver knew of the existence and the danger of this particular VEMCO line. Weaver and McMullin were "experienced" in moving farm machinery around and under VEMCO lines. They had taken specific precautions to move another line out of the way within days before the accident occurred, using the neoprene rubber gloves and the 16-foot PVC pipe, according to McMullin. Weaver's attempt to protect himself by putting on the neoprene gloves before mounting the picker strengthens the conclusion that he was acutely aware of the risk posed to him by VEMCO's lines. Weaver knew how close the lower line had cleared the moving picker three days before the accident (3-4"). Weaver knew and "respected" the fact that the upper line transmitted high-voltage electricity.

NEGLIGENCE COMPARED
Any person is legally required to recognize that his conduct involves a risk of causing harm to himself if a reasonable person would do so while exercising such attention, perception, memory, knowledge of other pertinent matters, intelligence and judgment as a reasonable person would have. Dobson, supra. Dobson, a tree trimmer who used mechanical equipment, failed to recognize that a nearby power line was a high voltage uninsulated line. As a tree-trimmer, Dobson was charged with the obligation of acquiring the knowledge and ability to recognize uninsulated lines and with constructive knowledge of the danger an uninsulated high voltage line posed to him. His safety "rope," which was entwined with a steel *1387 cable or wire, contacted the high voltage line, electrocuting him.
Applying, among other analyses, the Watson v. State Farm Fire & Cas. Ins. Co., 469 So.2d 967 (La.1985), factors, the Dobson court allocated negligence 40 percent to Dobson and 60 percent to the power company.
Applying the Dobson-Watson factors, we find: (1) that Weaver was aware of the danger when he undertook to remove the snagged lower-neutral conductor wire, notwithstanding that he wore the neoprene gloves, and is deemed to have unintentionally contacted the higher energized wire; (2) that the magnitude of the comparative risk was relatively equal because VEMCO's snagged line threatened the 15'9" high cotton picker, those in and around it, and Weaver's attempted manipulation of the snagged line threatened the picker and the same people; (3) that the purpose of Weaver's conduct was to accomplish release of the line to allow the picker to resume its picking operation in another cotton field, while VEMCO's failure to maintain the line at a reasonable height did not serve any significant VEMCO purpose; (4) that the particular circumstances could possibly have been viewed, however unreasonably, by Weaver as posing an emergency requiring a hasty decision to allow the picker to resume operation in another field; and (5) that VEMCO's capacity and ability to remove the risk of a low-hanging line was greatly superior to that of Weaver. Compare Dobson, supra, at 575-76.
Weaver's conduct, while more palpable than Dobson's conduct because of Weaver's greater knowledge, was relatively equal to the conduct of VEMCO, notwithstanding that VEMCO's failure to maintain the line caused Weaver's response and that VEMCO had the greater ability and capacity, practically and economically, to take precautions against the particular risk. On this record, we believe substantial justice will be achieved by allocating equal fault to VEMCO and to Weaver.

QUANTUM
In making an initial award of damages, we are not limited to either the highest or lowest in the range of awards which we would have affirmed on appeal. Our responsibility is to award an amount which is fair and just for the damages sustained. Morris v. Owens-Illinois, Inc., supra; Lee v. Great Southwest Fire Ins. Co., 493 So.2d 789 (La.App. 2d Cir.1986).
A high-voltage shock greatly traumatizes and injures the entire body. Horton, supra. Weaver sustained second degree burns on his left arm and underarm, left hand, and both feet, and third degree burns on his left hand and right foot. Fourteen percent of the surface area of Weaver's body was burned (13 percent second degree burns, and one percent third degree burns). The presence of significant and permanent scarring causes his muscles and thus his bodily movements to be severely restricted. Surgeries have only partially relieved restrictions in some areas.
Weaver was taken by ambulance to the hospital in Coushatta where emergency procedures were performed before he was transported to the Highland Hospital in Shreveport. There Weaver underwent a fasciotomy of left arm from shoulder to wrist, a procedure whereby the arm is surgically opened to facilitate circulation, two fasciotomies of his left hand, and surgical exploration of two wounds on the back. After these surgeries at Highland, Weaver was transported a day later to LSU Medical Center where he remained for 11 days.
On September 25, 1988, Weaver's left index finger and right toe were surgically amputated. He later underwent surgical debridements and had skin grafted to his left underarm and the inner part of his left arm.
In July 1989, a plastic surgeon performed a latissimus muscle skin flap, moving muscle and skin from Weaver's back to armpit, to relieve some of the limitation caused by scarring and allow him to raise his arm further away from his body. Weaver's orthopedist testified that after the skin-flap surgery healed by April 1990, Weaver could raise his arm at the shoulder only one-half of the normal 180 degrees, and could rotate his arm only 15 to 20 *1388 degrees in each direction, as compared to normal arm rotation of 90 degrees in each direction. Weaver was hospitalized about a week for this surgery.
In December 1989, a plastic surgeon performed additional surgery to release restrictions in Weaver's wrist.
Medical testimony corroborated that Weaver suffered great pain, had problems with his memory, and is physically unable to do many of the things he did prior to the accident. Weaver has not worked since the accident. He tires easily and is limited in what he can do. Weaver has a 38 percent to a 44 percent functional impairment of his whole body.
A rehabilitation counselor conducted a vocational evaluation of Weaver. Before the accident, Weaver had an I.Q. between 80 and 89. Weaver now has an I.Q. of 75. The rehabilitation counselor described Weaver as a functional illiterate with limited use of his left upper extremity. He concluded that there were no jobs existing locally, regionally, or nationally that Weaver could be expected to perform.
The w.c. carrier paid $94,553 in medical expenses and $16,487 in weekly w.c. benefits. Weaver's economist testified that his past losses of income and fringe benefits to the date of trial amounted to $30,206. This expert also testified that Weaver's loss of future earnings at the rate he was earning when injured (including benefits) had a discounted present value of $230,270. Even at minimum wage projections, the discounted present value of Weaver's loss of future earnings was said to be $138,564.
About a decade ago we affirmed an award of $100,000 for general damages and $6,175 for lost wages and medical expenses in personal injury action arising out of a natural gas explosion and fire that caused a plaintiff to suffer third degree burns over 24 to 29 percent of his body. Wiggins v. Arkansas Louisiana Gas Co., 441 So.2d 803 (La.App. 2d Cir.1983).
In Casanova v. Ballard, 533 So.2d 1005 (La.App. 1st Cir.1988), writs denied, another electrical injury case, $200,000 was awarded for general damages where the medical expenses amounted to $29,669, or not quite 1/3 of Weaver's medical expenses. Casanova suffered third degree burns of the feet, hands, back, and abdomen, and underwent numerous surgical procedures for debridement of the wounds, skin grafts and amputation of the big toe of the right foot. A second victim in that case was awarded $16,363 for medical expenses and $100,000 for general damages and loss of past and future income. The second victim suffered third degree burns of both feet and minor burns on both hands and chest, and underwent several surgical procedures, including amputation of the right great toe and a portion of the left great toe, skin grafts and debridement. He had a 15 percent loss of function in the right foot and 5 percent in the left.
In Lajaunie v. Central Louisiana Elec. Co., 552 So.2d 746 (La.App. 1st Cir.1989), writ denied, a $214,884 award for electrical burn injuries included $25,000 for loss of earning capacity.
Another plaintiff who sustained second and third degree burns over 18 percent of his total body surface, including his right abdomen, hip, arm, hand, and thigh, which resulted in multiple debridements and skin grafts, was awarded $64,566 for medical expenses, $100,000 for physical pain and suffering, mental anguish and distress, and permanent residual disability, $100,000 for impairment of earning capacity, and $15,000 for future medical expenses. Davis v. Husqvarna Motor, 561 So.2d 847 (La.App. 2d Cir.1990), writ denied. Also compare Horton v. Valley Elec. Membership Corp., supra.
Even more recently a $500,000 award for past and future physical and mental pain and suffering was found to be warranted for a worker who sustained orthopedic (a dislocated left elbow, a torn ligament in his left thumb, a broken and shattered right wrist, a broken left hip, and a fractured right rib) and electrical burn injuries (requiring skin debridements and grafts). This worker was also awarded $75,000 for scarring, disfigurement and bodily impairment (seven to eight percent because of orthopedic injuries), $48,079 for loss of income, and $61,135 for medical expenses. *1389 Graves v. Lou Ana Foods, Inc., 604 So.2d 150 (La.App. 3d Cir.1992).
Considering Weaver's injuries in the light of the above awards and of the record (his physical and mental impairments and restrictions, his scarring and disfigurement, his 38 to 44 percent functional disability), we assess damages which we believe are fair and just under the circumstances. We also recognize Commercial Union Insurance Company's right to be reimbursed from the award made to Weaver the amounts paid to him or for him under the w.c. law. At the time of trial, the amounts paid by the insurer were $94,553 for medical expenses and $16,487 in weekly benefits.

DECREE
We reverse the trial court judgment and hereby render judgment in favor of Weaver and Commercial Union Insurance Company and against VEMCO in these particulars:
Weaver's damages are assessed as follows:

past medical $ 94,553
past wages 30,206
loss of earning capacity 230,000
scarring and disfigurement 90,000
general damages 300,000
 ________
TOTAL $744,759

Fault is allocated 50 percent to Weaver and 50 percent to VEMCO.
Accordingly, judgment is hereby rendered in favor of Weaver and Commercial Union Insurance Company for one-half of the damages assessed, or $372,380, with legal interest from judicial demand, subject to, and with express recognition of, the statutory privilege in favor of Commercial Union Insurance Company for all amounts paid to or for Weaver in fulfillment of its obligation to him under the worker's compensation law, which at the time of trial were $94,553 paid for medical expenses and $16,487 paid in weekly benefits. LRS 23:1103(C); Taylor v. Production Services, Inc., 600 So.2d 63 (La.1992).
All costs, here and below are assessed to VEMCO.
REVERSED and RENDERED.
VICTORY, J., concurs in part, dissents in part with written reasons.
VICTORY, Judge, concurring in part, dissenting in part.
I agree with the majority opinion on the issue of punitive damages, but dissent from the rest of the opinion.
Undoubtedly, VEMCO's negligence in failing to maintain the neutral line at a minimum 16' height was a legal cause (along with the plaintiff's negligence) of the cotton picker contacting the neutral line. However, the plaintiff was not injured as a result of the picker contacting the neutral line. If he had been injured at that time, this would clearly be a case of comparative negligence.
In my view, the jury took a very practical approach to this case and decided that basically two events occurred. First, the cotton picker came in contact with a non-energized line negligently maintained too low by VEMCO. The plaintiff, due to his prior knowledge and experience with the cotton picker and the defendant's lines, was partially responsible for this event because he was aware that the line might be too low and that he could keep the cotton picker from contacting the neutral line by the use of the long plastic pole that he had used to raise a neutral line a few days earlier. Thus, at the end of the first event, due to the negligence of the plaintiff and VEMCO, the cotton picker was in contact with the non-energized line, but no injury had occurred.
The second event then occurred, caused by the plaintiff's sole negligence. Prior to climbing on top of the cotton picker, the plaintiff was not in any danger, had not been injured, there was no emergency, and time was not of the essence. He had many options available to him at that time, all but one of which would have resulted in no injury whatsoever. However, of his own volition, he chose to climb on top of the cotton picker and place himself in close *1390 proximity to the "hot" line. Unfortunately, he suffered a serious injury as a result. The jury found that VEMCO's negligence was not a legal cause of this second event, in effect, concluding plaintiff was 100% at fault for the second event.
The legal principles involved in this case are the same as in Fowler v. State Farm Fire and Casualty Insurance Company, 485 So.2d 168 (La.App. 2d Cir.1986). Fowler and several others were inadvertently locked outside on a second story balcony while visiting at a home. The homeowners were alleged to be partially responsible for this event by not bringing the house key onto the balcony and in allowing an automatic door lock to be operational. None of the group on the balcony was in any danger, and there was no emergency situation. Thereafter, because he did not desire to remain on the balcony until the group could attract someone's attention to let them inside, Fowler jumped off the balcony onto the ground, fracturing his right leg and left ankle. Although there is an "ease of association" between the homeowners' alleged negligence, which arguably caused the plaintiff to be locked out on the balcony, and the plaintiff's actions in jumping from the balcony, this court affirmed the trial court's denial of relief to the plaintiff, concluding that the homeowners' actions were not a legal cause of the plaintiff's injury. This court found the sole legal cause of the plaintiff's injuries was his decision to jump from the balcony and his error in judgment as to the feasibility of safely landing on the ground ten feet below. See also Mack v. City of Monroe, 595 So.2d 353 (La.App. 2d Cir.1992) in which we held that the City of Monroe did not legally cause the plaintiff's harm inflicted on her by her boyfriend by failing to arrest him some 12 days earlier on a warrant sought by plaintiff, when plaintiff placed herself in close proximity to the boyfriend, knowing of his recent violence and that he was not in jail.
Legal cause is an issue of mixed fact and law or policy. Whether or not a party's negligence is a legal cause of an injury is a question for the trier of fact and should not be disturbed unless the issue is so clear that reasonable persons could not differ. See Roberts v. Benoit, 605 So.2d 1032 (La. 1991), Justice Dennis dissenting. In my view, although other triers of fact might have decided the case differently, I am unable to say the jury's determination that VEMCO's negligence was not a legal cause of plaintiff's injury is so clearly wrong that reasonable persons could not differ about it. Therefore, the jury's determination should be affirmed.
For these reasons, I respectfully dissent.