JiBROWN, Judge.
This case arises out of a two-vehicle accident that occurred on La. Hwy. 7 in Webster Parish, Louisiana, on April 17, 1988. A jury found that the accident was caused solely by the negligence of defendant, Bradley Duke, who was the driver of one of the vehicles. Judgment was rendered in favor of plaintiffs, the Greers, and against defendants, Bradley Duke, Donald Duke, Bradley’s father and owner of the truck driven by Bradley, and State Farm, their insurer. Both plaintiffs’ and defendants’ claims against third-party defendant, Pool Company, d/b/a Pool Production Services, were dismissed. Although 20 days earlier Pool’s negligent acts resulted in a spill near the scene of the accident, the jury found that the .spill was not a cause-in-fact of the accident. Plaintiffs, the Greers, have appealed. For the reasons set forth below, we affirm.

FACTS

At approximately 12:50 p.m. on Sunday, April 17, 1988, Bradley Duke was heading north on La. Hwy. 7 in his father’s 1979 Ford pickup truck. Henry Greer, with wife, Betty Greer, as a passenger, was heading south on ,Hwy. 7. The road was slick following a heavy rain and there was a light mist. As Duke approached the intersection of Hwys. 7 and 802, he lost control of his truck and began to fishtail. He was able to maintain control and remain in the northbound lane until he reached the intersection. Just past the intersection, Duke went off the road onto the right shoulder and upon returning to the roadway, his truck spun sideways and struck the Greers’ 1986 Ford pickup truck.
Pool Production Services has an operations and storage yard in Porterville, Louisiana, on La. Hwy. 802 near the intersection of Hwys. 7 and 802. On March 29, 1988, at this yard, Pool had approximately 30 large frac tanks.[1] *1055 These tanks are moved to drilling sites for the temporary storage of drilling mud, salt water and other fluids recovered from underground wells.
On March 29, 1988, while a Pool employee was moving some of the frac tanks from Rthe yard on Hwy. 802 to a disposal well south on Hwy. 7, approximately one to two barrels (42-84 gallons) of frac gel splashed out of one of the tanks. Frac gel, a glutinous, jelly-like substance, is used during drilling operations to prevent the drill bit from sticking. The hinged cover to the clean-out hatch on the side of Pool’s frac tank was not in place. Because these tanks were usually stored empty, no one at the operations yard checked to see whether there was anything in the tank or that the hatch lid was secured.
Frac gel began spilling out of the tank just outside of Pool’s yard on Hwy. 802. Tommy Helms, owner of the automotive repair shop/garage located at the intersection of Hwys. 7 and 802, witnessed the spill. According to Helms, a large amount of fluid spilled out of the frac tank’s side hatch at the intersection and for a considerable distance south on Hwy. 7.
Helms called Pool Production Services and told Monty Youngblood, Pool’s truck supervisor, that a large quantity of what appeared to be frac gel had spilled onto the highway. Youngblood sent water trucks to the spill and assisted several Pool employees in attempting to wash the spilled matter from the roadway. However, as frac gel is hydrophobic (water repellent), large globs of the gel were washed away, but a filmy layer remained. Several law enforcement personnel were on the scene, who, together with Youngblood and Tommy Emanis, Pool’s rig operator, directed traffic and alerted motorists of the spill.
Later the same day, the Department of Transportation and Development (“DOTD”)' sent a crew with a sand truck to the spill site. Alton Cook of DOTD testified that' he and his crew dumped and spread sand in the intersection and south of the intersection down Hwy. 7 in both lanes of travel.
Tim Briley of the Department of Environmental Quality (“DEQ”) inspected the site on the day of the spill, collected some of the material from the roadway and requested that Pool have the sample analyzed to determine whether it contained hazardous materials.
An analysis by Faulkner Laboratories was made and Faulkner Labs’ report dated 13April 22, 1988, revealed that the spilled matter in fact contained hazardous materials. DEQ ordered Pool to clean up the contaminated area. On May 12, 1988, Jones Environmental applied “Safe Step” absorbent to the affected portion of the highway and removed contaminated soil from the highway shoulders.
Henry and Betty Greer filed suit against Donald and Bradley Duke and State Farm, their own uninsured motorist and the Dukes’ liability insurer, alleging that Bradley Duke’s careless operation of his father’s truck caused the accident and their injuries. The Greers also sued Pool Production Services, claiming that the accident was caused by slippery highway conditions, which were a result of the March 29, 1988, spill.
The Dukes and State Farm answered plaintiffs’ petition, asserting that the accident was precipitated by the oily substance spilled in the highway by Pool. Defendants also filed a cross-claim and third-party demand against Pool.
Pool filed an answer denying the allegations set forth by plaintiffs and defendants and asserted a cross-claim against the Dukes and State Farm. Pool admitted negligence in connection with the March 29th spill but asserted that the spill, which occurred two and one-half weeks before the accident, was not a cause-in-fact of the accident.
The trial of these consolidated cases took approximately two weeks and the jury’s verdict was returned on July 7, 1993. The jury found that the accident was caused solely by the negligence of Bradley Duke and rendered judgment in favor of plaintiff, Betty Greer, and against defendants, Donald and Bradley Duke and State Farm, in the amount of $183,000 less 2% mitigation (for Mrs. Greer’s failure to wear a seatbelt). Judgment in favor of Henry Greer and against *1056 the Dukes and State Farm in the amount of $7,950 was also rendered.
All claims against Pool were rejected and dismissed with prejudice. Judgment was signed on August 27, 1993. It is from this judgment that the Greers have appealed.[2]
I ¿DISCUSSION
Conduct is a cause in fact of a harm if it was a substantial factor in bringing about the harm. Dixie Drive It Yourself Systems v. American Beverage Company, 242 La. 471, 137 So.2d 298 (1962); Weaver v. Valley Electric Membership Corp., 615 So.2d 1375 (La.App. 2d Cir.1993). The cause in fact inquiry, which is totally factual, is the threshold inquiry in a negligence action. If a defendant’s conduct is not found to be a cause in fact of the plaintiffs injury, further analysis is unnecessary. Weaver, supra.
Since causation is a fact question, the trier of fact’s finding cannot be disturbed absent manifest error. Housley v. Cerise, 579 So.2d 973 (La.1991); Rosell v. ESCO, 549 So.2d 840 (La.1989); Poland v. Glenn, 623 So.2d 227 (La.App. 2d Cir.1993). A reviewing court must always keep in mind that if the trial court or jury’s findings are reasonable in light of the record reviewed in its entirety, it may not reverse even if convinced that had it been the trier of fact, it would have weighed the evidence differently. This well-settled principle of review is based on the better capacity of the trier of fact to evaluate live witnesses and the proper allocation of functions between trial and appellate courts. Thus, when two permissible views of the evidence exist, the jury’s choice cannot be manifestly erroneous or clearly wrong. Stobart v. State Through DOTD, 617 So.2d 880 (La.1993).

Testimony: The Spill

Monty Youngblood is a supervisor at Pool’s storage yard on Hwy. 802. On the date of the spill, using water from two pump trucks, Youngblood and several of his employees attempted to wash the spilled material from the roadway. Youngblood stated that while the application of water did not completely remove the oily film from the road, large clumps of the matter were washed away.
Alton Cook, DOTD, testified that on the date of the spill, he and his crew dumped and spread sand in the intersection and south on Hwy. 7 about 7/10 of a mile. Cook was satisfied that DOTD’s clean-up procedure was adequate.
RTommy Helms witnessed the spill. On the date of the spill, Helms observed Pool employees washing the spilled substance off the highway. He also witnessed DOTD workers dumping and spreading sand on the roadway. Helms, whose business and residence are located just south of the intersection of the two highways, stated that he never experienced any problems driving on the roadway following the spill, nor did he notice any difference in the condition of the road.
Helms noted that he has witnessed accidents or “close calls” at the intersection almost every day. According to Helms, the roadway is substandard and rutted because of the number of log, gas and other large trucks that use Hwy. 7. Helms further stated that water collects in the ruts when it rains, making the road surface slick and dangerous. Additionally, the large trucks are constantly leaking fluids and gases onto the roadway.
Tommy Helms’s son, Jeff, also saw the spill. Jeff Helms stated that the intersection is very busy and because of heavy traffic, the road is rutted and slick. Jeff did feel that the road was slicker following the spill on March 29,1988. Jeff noted that a week after the spill, while pulling out of his father’s driveway onto Hwy. 7, during a heavy rain, he skidded.
Tim Briley, with DEQ, testified that he inspected the spill site on March 29, 1988. At the scene, Pool personnel told Briley that the spilled material was non-hazardous. A laboratory analysis later revealed that the spilled substance contained hazardous mate *1057 rials.[3] Had the material in fact been nonhazardous, Briley testified that the clean-up efforts of DOTD would have been sufficient. However, due to the hazardous nature of the spill, Briley stated that more strenuous clean-up measures were necessary.
Briley testified that a clean-up was performed on May 11, 1988, by Jones Environmental. On this date, Briley observed some material still on the roadway, though the majority of what he saw was on the shoulders. Because DEQ’s concern was with the hazardous nature of the spilled substance and its impact on the environment, not the | eslipperiness of the material, Briley at no time checked the surface condition of the roadway.
Sharon Alexander, chemist at Faulkner Labs, analyzed the spill sample. In addition to finding traces of hazardous materials, Alexander noted the sample’s slickness, which was retained by the sample throughout the testing process. The sample contained pa-raffins and napthenic compounds.

Testimony: The Accident

Bradley Duke testified that he was heading north on Hwy. 7 at a speed of approximately 45-50 m.p.h. on April 17, 1988. He lost control of his truck after rounding a slight curve when he hit a slippery spot near the parking lot of Cart Motors, which is about 230 feet south of the intersection. According to Duke, when he rounded the curve on Hwy. 7, it felt like he was on ice; the truck began moving right and left and the rear end of the pickup came out from under him. Duke stated that he did not accelerate once he lost control, but that the truck continued to fishtail. However, Duke was able to maintain control of his truck until he reached the intersection. The entire truck began sliding near Helms’s garage. Duke testified that he applied his brakes and just held on to the steering wheel once the truck slid sideways. He saw the Greers and tried to avoid hitting them.
Henry Greer testified that he and Mrs. Greer were heading south on Hwy. 7 on the date of the accident. Their truck was behind another truck and their approximate speed was 40-45 m.p.h. As he approached the intersection, Greer noticed a truck coming in his direction. The truck fishtailed as it came through the intersection, then went off the road onto the right shoulder just past the intersection. Upon pulling back onto the highway, the truck slid sideways into Greer’s lane. Greer testified that he hit his brakes and braced himself for the unavoidable impact.
Betty Greer testified that she saw Duke’s truck fishtailing as if it were out of control. The truck swerved and, as if traveling on ice, shot across the highway sideways.
C.D. Lee was the Louisiana State Trooper who worked the accident. Trooper Lee inspected the accident scene and interviewed the persons involved and Grady Franklin, who ^witnessed the accident. Duke told Trooper Lee that he was going 55 m.p.h. when he hit a slick spot and began to fishtail. Trooper Lee noted that the highway was wet and because of Duke’s statement of loss of control upon hitting a slippery spot, he checked the road surface. However, Trooper Lee found no indication that the roadway or intersection was any slicker than normal, given the weather conditions.
Grady Franklin was traveling south on Hwy. 7 at approximately 40 m.p.h. and was in the vehicle directly in front of the Greers. Franklin stated that the road was wet because it had just stopped raining. Franklin saw a truck coming towards him as he neared the intersection and noticed that the driver appeared to be out of control because of the truck’s side to side movement.
Franklin pulled his truck off the road to avoid being hit by the oncoming truck, which was across the center line as it came through the intersection. Through his rearview mirror, Franklin saw the truck hit the vehicle that Franklin had been in front of before he pulled off the road. According to Franklin, the Greers did not have time to avoid an impact with the out-of-control truck. Franklin related to Trooper Lee that the road *1058 surface was slick, especially when wet and that although he did not think Duke was going over the speed limit, he believed that Duke was traveling at an excessive speed given the weather and the wet road conditions.
While working at the Porterville Country Store, which is located at the intersection of the two highways, Theresa Stewart, on the day of the accident, looked out of the window upon hearing the squeal of brakes. Stewart observed Duke’s truck fishtailing as he struggled with the steering wheel. She then saw Duke’s truck slam into the Greers at a speed of approximately 35 m.p.h.
Stewart testified that she experienced slippery road conditions after the spill of March 29, 1988. According to Stewart, the road was slick even after DOTD applied sand to the spill, although as time passed, the slipperiness decreased. Stewart also noted that the traffic on Hwy. 7 is heavy, as it is frequently used by log trucks and other 18 wheelers.
| ⅝Expert Testimony: Causation
John Glennon, a civil engineer specializing in highway safety, testified for plaintiffs. Glennon conducted skid tests with a sample of a substance identified as frac gel. This sample was obtained by plaintiffs’ counsel from an oilfield supply company because none of the material that was spilled in March 1988 had been preserved. Glennon stated that a wet, paved surface with frac gel and sand in the spaces between the asphalt is very slick. According to Glennon’s calculations, Duke, who was going 45-55 m.p.h. before the impact, had an impact speed of 33 m.p.h. Glennon concluded that the accident was caused by the slippery substance on the roadway.
On cross examination, Glennon noted that he had no idea of the location and size of the spill, nor was he aware of the slipperiness of the roadway before the spill. Glennon conceded that if Duke was going 55 m.p.h. pre-impact, this speed was excessive given the weather conditions. Glennon also stated that if the material he tested was substantially different than the substance spilled by Pool, then his tests are not a valid indication of the road conditions following the spill.
Plaintiffs also relied on the testimony of Kenneth Daugherty, a consultant for the petroleum industry. As was Glennon, Daugherty was provided by plaintiffs’ counsel with a sample of a substance identified as frac gel. Based on the lab report from Faulkner Labs, he concluded that though not identical, the sample from the spill and the sample he was given to analyze were very similar.
According to Daugherty, frac gel penetrates the pores of the asphalt, creating a slick surface. Sand is not a good absorbent; therefore, its application would remove only a portion of the paraffins in the spilled material, which are what cause the slickness. Additionally, application of water to such a spill would increase the road’s slipperiness. Daugherty testified that the spilled substance could have remained on the asphalt roadway in excess of 19 days.
John Jacobus, an engineer qualified as an, expert in the field of chemistry, testified on 19behalf of defendant, Pool Production. As there was no material left from the spill that could be analyzed, Jacobus obtained a sample from a holding tank at Pool’s yard on Hwy. 802. Jacobus analyzed the sample’s composition and performed sled tests. According to Jacobus, the sample he analyzed was very similar to the substance analyzed by Faulkner Labs in that both were primarily made up of paraffinic and napthenic compounds. Jacobus stated that application of sand is an effective way to clean up a spill of material containing these compounds. Additionally, application of water, including rainfall, would wash away the substance and traffic would spread the matter thinner and thinner until it dissipated from the road.
Jacobus also examined a sample of the substance analyzed by plaintiffs’ experts. According to Jacobus, the sample analyzed by Glennon and Daugherty, upon which their conclusions about what caused the accident were based, was markedly different than the substance that spilled out of Pool’s' frac tank. Jacobus noted that plaintiffs’ sample contained a synthetic paraffin and that to compare it to the substance spilled by Pool was like “comparing an orange to a banana.” It was Jacobus’s opinion that 18-19 days after *1059 the spill, there would have been no significant residue on the roadway.
Robert Jac Cooper, a mechanical engineer qualified as an expert in accident reconstruction, also testified for defendant, Pool Production. According to Cooper, the accident was caused by Bradley Duke’s excessive speed, given the weather and road conditions. Cooper stated that Duke’s truck hydroplaned and that as Duke tried to regain control, his truck crossed the center line and struck the Greers. Given the damage to the vehicles and the distance traveled by them after impact, Cooper concluded that Duke was going 55 m.p.h. at the time he lost control and began to fishtail and that Duke had a speed at the time of impact of 33-35 m.p.h. According to Cooper, his conclusion that Duke hydroplaned is supported by Duke’s testimony that he was able to stay mainly in his lane and testimony of witnesses that Duke’s rear end was going back and forth.
Cooper also concluded that Duke, after sliding off the road just after going through | ipthe intersection, was able to get his truck back onto the road because of traction. Had Duke’s vehicle been sliding on slippery material such as frac gel, the truck would have continued sliding off the road and Duke would have been unable to get back onto the highway.
The jury found that the accident was caused solely by the negligence of defendant, Bradley Duke. Our independent review of the evidence in its entirety reveals two permissible views concerning whether the spill was a substantial factor in causing the accident. Thus, the jury did not abuse its’ discretion. Therefore, we do not reach plaintiffs’ other assignments of error.

CONCLUSION

For the reasons set forth above, the judgment of the trial court is affirmed. Costs are assessed to appellants. AFFIRMED.

. A frac tank is a large, rectangular, fabricated metal trailer approximately the size of a commercial moving van.

. On August 31, 1993, the Greers filed a receipt and satisfaction of judgment acknowledging receipt of $54,407.76, reflecting a compromise and settlement reached with State Farm. Thus, the judgment in favor of the Greers against the Dukes and State Farm is considered satisfied in full.

. We note that all of the experts testified that a substance's classification as hazardous has nothing to do with its slippery nature and vice versa.