747 So.2d 1276 (1999)
Jeanne Robertson wife of/and Edward ROBERTSON, Jr., Plaintiff-Appellants,
v.
STATE of Louisiana through DEPARTMENT OF PLANNING AND CONTROL, ABC Insurance Corporation, Louisiana Tech University, XYZ Insurance Corporation and Louisiana Board of Trustees for State Colleges and Universities, Defendant-Appellees.
No. 32,309-CA.
Court of Appeal of Louisiana, Second Circuit.
December 10, 1999.
Writ Denied February 25, 2000.
*1277 Murray Law Firm by Stephen B. Murray, Charles R. Ward, Jr., New Orleans, Counsel for Appellants.
Louisiana Department of Justice by James R. Dawson, Shreveport, Counsel for Appellees.
Before BROWN, CARAWAY and KOSTELKA, JJ.
CARAWAY, J.
After their son died from head injuries from a fall from the roof of the university's natatorium, plaintiffs brought this wrongful death action against the university and other state entities. Plaintiffs assert that the university was negligent in failing to prevent access to the roof after other students had previously climbed the roof and fallen. The trial court rejected plaintiffs' claims and granted defendants' summary judgment. We affirm.

Facts
Joanne and Edward Robertson bring this wrongful death action for the loss of their son, Trey Robertson ("Trey"). Named as defendants were Louisiana Tech University ("Tech"), the Board of Trustees for State Colleges and Universities, and the State of Louisiana, through the Department of Facility Planning and Control. In support of and in opposition to the defendants' summary judgment motion, the parties submitted several depositions, affidavits, photographs and documents. The submissions by both parties are fairly consistent and the facts demonstrated by them are summarized as follows.
In 1984, Tech constructed a roof (hereinafter the "Roof") over its swimming pool or Natatorium. As shown by a photo of the Natatorium (Appendix A), the Roof extends to within several feet of the ground with steel beams or buttresses sloping beyond the roof line to the ground. After hoisting himself up on one of the buttresses, a person would have to negotiate approximately 154 feet of the metal roof to its apex which is approximately 56 feet off the ground.
The Natatorium is located on the campus close to the dormitories and the Kappa Alpha fraternity house. A major artery of the campus, Tech Boulevard, runs beside the building, and the campus cafeteria is next door. Students must routinely walk past the Natatorium going to and from classes to the dorms.
As construction was completed, there were two reported incidents of students climbing the Roof in 1985. The first incident was on January 24, 1985. Two male students were observed climbing the Roof at approximately 11:38 p.m. According to the campus police report, the students appeared to be intoxicated. Neither student was injured.
On September 6, 1985, four students were observed on the Roof at approximately 12:47 a.m. One student fell or jumped from the south end of the roof and *1278 suffered a compound fracture of his vertebrae. Again, the police report indicated that the students appeared to be intoxicated.
When the Roof was built, Robert Dowling was the Director of the Natatorium. Dowling's deposition, submitted by both parties, stated that following these two midnight climbing excursions "informal" discussions took place about the problem. Dowling stated that his boss, the Director of Recreation, and the campus engineer took part in the discussions. Although recognizing the problem, they concluded "that there was nothing that could be done about it that would actually stop it from happening...."
Thereafter, on August 24, 1989, at around 11:15 p.m., a student climbed one side of the roof then fell down the other side. He sustained a broken wrist and compressed and fractured vertebrae. According to the police report, this student had also been drinking.
Following this 1989 incident, Dowling testified that renewed discussions concluded that because the students were intoxicated "it (preventative action) was not something that they deemed necessary" and that there was "really no answer" to the problem. Therefore, nothing was done by Tech to attempt to prevent further incidents or accidents.
Plaintiff's submitted the deposition of Patrick Gibbs, who is now Vice-Chancellor for Property and Facility Development at the University of New Orleans ("UNO"). In 1983, Gibbs was Vice-Chancellor for Business Affairs at UNO. Gibbs noted that at that time, the UNO Lakefront Arena was built on the UNO campus. The UNO Lakefront Arena, a multi-purpose facility used for basketball and swimming, is larger than Tech's Natatorium; however, both facilities used the same type design for the roof over their swimming pools. The roof supports at the UNO facility extend to the ground; and because of reports that children were trying to climb these supports to reach the lower roof, a decision was made to plant shrubbery around the base of the supports. The photographs submitted in connection with Gibbs' deposition showed thick shrubbery at the base of the buttresses. The cost for the shrubbery was about $3,300. Gibbs stated that since the shrubs were planted there have been no further problems or complaints about anyone attempting to climb the roof. The shrubs were planted in 1984, the year that Tech's Natatorium roof was constructed.[1]
Trey was a 23-year-old senior at Tech living on campus in the Kappa Alpha fraternity house. Shortly before 1:47 a.m. on April 5, 1991, Trey was walking back to his room after visiting with a friend. His route took him past the Natatorium. Trey had been drinking that night; however, his blood alcohol level, estimated to have been.073 at the time of his fall, was below what the law presumes for a person to be considered under the influence. In an interview with campus police the afternoon following his fall, Trey stated that he decided to climb the Roof to get a good view of the campus. At the Roof's peak, he stepped onto the other side, slipped and slid down. He stated that he hit the raised edge of the Roof and then apparently tumbled off, striking the ground. He suffered head injuries and died on April 11, 1991 at Oschner Medical Center in New Orleans.
In granting summary judgment in favor of the defendants, the trial court relied heavily on another case involving a student accident at Tech, Pitre v. Louisiana Tech University, 95-1466 (La.5/10/96), 673 So.2d 585, cert denied, 519 U.S. 1007, 117 S.Ct. 509, 136 L.Ed.2d 399 (1996). The court concluded:

*1279 Since the danger posed from falling off a roof (that is not intended as a recreational or viewing area) is obvious to all, the roof was not unreasonably dangerous. As such, the defendant owed no duty to prevent Edward [Trey] from climbing onto the roof and, thus the State has no liability to Edward under a negligence theory.

Discussion

Propriety of Summary Judgment
The summary judgment procedure is designed to secure the just, speedy, and inexpensive determination of any action. The procedure is favored and shall be construed to accomplish those ends. La. C.C.P. art. 966(A)(2). A motion that shows that there is no genuine issue as to material fact and that the mover is entitled to judgment as a matter of law shall be granted. La. C.C.P. art. 966(C)(1). Summary judgment is appropriate when all the relevant facts are marshalled before the court, the marshalled facts are undisputed, and the only issue is the ultimate conclusion to be drawn from those facts. Smith v. Our Lady of the Lake Hospital, 93-2512 (La.7/5/94), 639 So.2d 730, 752.
In this case, while Tech moved for and was awarded summary judgment, the plaintiffs do not assign as error the existence of a genuine issue as to material fact. In fact, all of plaintiffs' assignments of error insist that the evidence is undisputed and that Tech breached a duty or duties under various theories of law.
From our review of the extensive body of evidence submitted by both sides, the summary judgment motion, though urged only by one party, has been treated by both parties like a submission to the trial court (and now to this court) of the liability case for decision. From a pragmatic view, understanding that this suit against the governmental entities will not be tried before a jury, the trial court's decision that Tech did not breach any duty owed to Trey because of the design of the Roof, or the three prior incidences involving the Roof, will be difficult to alter by our remanding the case for determination of an ill-defined fact issue which neither party is now suggesting.[2]
Despite not being directed by an assignment of error to a material issue of fact, we have nevertheless reviewed the record with that concern. We have determined, however, that the basic facts of this controversy are not in dispute. The campus police records of the three incidents of students on the Roof involved occurrences in years prior to this accident. Those records best reflect the details of those events and undisputedly establish facts upon which the plaintiffs heavily rely. The description of this accident is best preserved in Trey's statement prior to his death. The design of the Roof's slope, the construction of the Natatorium and the location of the building on the campus are relevant facts which have also been clearly presented. While Tech has acted in constructing the building and policing its campus, this controversy primarily centers on Tech's inaction. There can hardly be a material fact dispute surrounding Tech's inaction. Tech's officials were fully aware of the three prior incidents and did not act to prevent further access to the Roof.
Accordingly, on the undisputed evidence, the favored summary judgment procedure is now appropriate. In making this ruling, we are mindful of the controversy that surrounded the Pitre decision as it passed through this court twice involving the effect of the initial summary judgment rulings, see footnote 2, supra, *1280 and also mindful of our supreme court's differing views of whether Pitre was a no duty case or a no breach of duty case. Admittedly, the proposed duty to be considered cannot be said to involve a situation "controlled by a rule of law of enough breadth and clarity to permit the trial judge in most cases ... to dismiss the complaint or award summary judgment." See concurring opinion, Justice Lemmon, Pitre v. Louisiana Tech University, 95-1466 (La.5/10/96), 673 So.2d 585, 596, quoting Robertson, et al, Cases and Materials on Torts 161 (1989). The scope of a university's duty to its students has undergone change since the 1960's and continues to be defined by the courts. See, Fox v. Board of Louisiana State University, 576 So.2d 978 (La.1991) and Bradshaw v. Rawlings, 612 F.2d 135 (3d Cir.1979). In this case, the plaintiffs in their brief "concede that the State [Tech] definitely had no duty to the first student who entered the premises [Roof] in early 1985, and probably had no duty to the second who entered the premises in late 1985." The plaintiffs request this court to impose upon Tech a duty to act thereafter in an undisputed context where Tech never acted. Whether the commentaries might define this court's task as a ruling on the existence of the university's duty, the scope of the general duty to act reasonably toward its students, or a breach of duty, the undisputed material facts now presented allow us to make that ruling in this summary judgment context.[3]

Unreasonable Risk of Harm
The plaintiffs argue that the Roof presented an unreasonable risk of harm to others or a vice in a thing in Tech's custody creating liability under La. C.C. arts. 2317 and 2322. Article 2317 provides the general principle that we are answerable for the damage occasioned by things which we have in our custody. Article 2322, applying that principle to the owner of a building, states, "The owner of a building is answerable for the damage occasioned by its ruin, when this is caused by neglect to repair it, or when it is the result of a vice in its original construction."
The owner of a building cannot be held responsible for all injuries resulting from any risk posed by his building, only those caused by an unreasonable risk of harm to others. Entrevia v. Hood, 427 So.2d 1146, 1149 (La.1983). The defect must be of such a nature as to constitute a dangerous condition which would reasonably be expected to cause injury to a prudent person using ordinary care under the circumstances. Penton v. Schuster, 98-1068 (La.App. 5th Cir.3/30/99), 732 So.2d 597. In discussing the judicial process for the determination of unreasonable risk of harm posed by a thing, the supreme court, in Boyer v. Seal, 553 So.2d 827, 834-835 (La.1989), observed:
As Loescher observes, the person who has the guardianship and usually the enjoyment of the person or thing should bear the cost of damage caused by risks they create rather than the innocent victim. Further, it is thought that the guardian is in a better position to anticipate, detect, guard against, and insure against these risks, making him a better risk spreader and more efficient conductor of the deterrent effects of civil liability. A competing policy, however, is that the guardian should not be responsible for protecting against all risks; some risks are relatively too small to require him to protect others therefrom.
* * *
This court has explained that the judicial process involved in deciding whether a thing under garde posed an unreasonable risk of harm is similar to that of taking into account all of the social, moral, *1281 economic and other considerations as would a legislator regulating the matter. [citations omitted] We have also noted that the unreasonable risk of harm concept is virtually identical with the risk-utility balancing test that is part (but not all) of both negligence and strict products liability theories in Anglo-American law.
Article 2322 indicates that a risk posed by a building may result from a vice in its original construction or some defect or deterioration of the building because of its disrepair or ruin. The article does not apply to a properly functioning building with no hidden trap or vice in its construction or no deteriorated condition. Prior to the 1996 amendments to these Civil Code articles, Louisiana's doctrine of strict liability under La. C.C. arts. 2317 and 2322 developed in cases which addressed defective things such as a rotten tree,[4] broken steps,[5] a seawall with a hole,[6] a shallow swimming pool with no warning signs,[7] and submerged rip rap along a public lakefront area.[8] In contrast, if a properly functioning, non-defective building becomes a lure causing a person to misuse the structure in a manner where an obvious danger is deliberately encountered, the risk posed is not created by the owner's custody of the thing. There is no hidden defect, disrepair or ruin. The risk is not posed by the unreasonable condition of the thing, but by the deliberate misuse of the thing by a victim.
In this case, the Roof properly functions as a roof. The condition of the Roof presented nothing inherently dangerous for Tech to repair or warn others about. The fact that a person can climb onto the Roof by its steal beam buttresses, which are more accessible than the structures for most roofs, falls outside the intended and expected use of the Roof. This is not a hidden feature of the building by which an unsuspecting or careless victim is harmed while using the building. The design of this type of roof structure is not an uncommon design. A person could not become confused or allured into the act of climbing the Roof under an illusion of safety like the two swimmer/divers in Murray, supra and Socorro, supra.
Accordingly, we do not view this structure as posing an unreasonable risk of harm. By the concession and analysis made by the plaintiffs, as quoted above from their brief, the building as constructed was not defective so as to make Tech liable to the initial climbers of the Roof. The issue is better considered under the standards for negligence in terms of Tech's duty to its students after the previous accidents involving the Roof.

NegligenceUniversity/Student Relationship
In addition to the issue of whether Trey was injured through the instrumentality of an unreasonably dangerous thing in Tech's custody, we are further asked to consider whether Tech was unreasonable in not acting to dissuade its students from climbing on the Roof. After the three prior instances of students climbing the Roof, plaintiffs insist that Tech became obligated to either plant shrubbery around the perimeter of the Natatorium, particularly near the steel beam buttresses, or to fence the area to dissuade access.
In Fox, supra, the university was alleged to have failed to sufficiently supervise and control the L.S.U. rugby club during a rugby tournament on the campus. The plaintiffs injury was blamed upon his fatigue, which was attributed to the rugby club's scheduling of two matches for plaintiff's team on the same day following a late night cocktail party for the teams.
*1282 In reviewing the university's duty and the allegation of its failure to provide adequate safety, the supreme court first noted:
Typically, in cases such as this, where the alleged wrongful conduct of the defendant is a failure to act or "nonfeasance," courts have found it necessary for some definite relationship between the parties to exist, such that social policy justifies the imposition of a duty to act upon the defendant. W. Prosser & W. Keaton, The Law of Torts, Sec. 56 (5th ed.)
Fox, supra, at 981. Finding that no special relationship existed and that L.S.U. had no duty to act, the court said:
The fact that a club at L.S.U. invited plaintiff's team to L.S.U. does not make L.S.U. the guardian of all of the participants' safety. Of course, L.S.U. must ensure that its premises are free from defects and are suitable for activities conducted there. The parade ground is used often by students of L.S.U. and the general public for athletic activity. To require L.S.U. to ensure the athletic ability of everyone utilizing this area would be too onerous.
Id.
While it can be argued that Fox never addressed the existence and implications of a special relationship because the injured student did not attend L.S.U., the court's analysis broadly examined the university/student relationship from the perspective of L.S.U.'s responsibilities for the safety of all student participants. The university was not placed under an enhanced custodial-like duty to protect against the irresponsible choices of students, and the court found that "L.S.U. had no duty to act." Fox, supra at 982. In the later decision in Pitre, the supreme court stated:
In Fox, supra, this Court acknowledged that universities no longer stand in loco parentis to their students, noting that attempts to foster the educational process, and the growth and maturation of students had relieved universities of many of their protective duties. Under the modern university-student relationship, "the college student is considered an adult capable of protecting his or her own interests; students today demand and receive increased autonomy and decreased regulation on and off of campus."
Pitre, supra, 673 So.2d at 595. Other courts have reviewed the modern university/student relationship, and like Fox and Pitre, have not imposed upon universities custodial duties for the protection against injury from youthful misjudgments, pranks or alcohol-related accidents. See, Bradshaw v. Rawlings, supra; Beach v. University of Utah, 726 P.2d 413, 62 A.L.R.4th 67 (Utah 1986); and Rabel v. Illinois Wesleyan University, 161 Ill.App.3d 348, 514 N.E.2d 552, 112 Ill.Dec. 889 (1987).
Claims that the relationship of the parties or the age of the victim gives rise to an affirmative duty of protection have also been addressed in related contexts. The issue of "Dram Shop" liability addressed by the jurisprudence and under La. R.S. 9:2800.1 has generally not resulted in the imposition of liability on the seller or server of alcoholic beverages. In Pence v. Ketchum, 326 So.2d 831 (La.1976), the court held that a cause of action exists and the suit could not be dismissed where the bar owner ejected the intoxicated patron onto a busy highway in a helpless condition. Nevertheless, in Thrasher v. Leggett, 373 So.2d 494 (La.1979), the court denied the bar owner's liability and overruled the trial court's judgment for the plaintiff explaining the limited scope of the Pence ruling as follows:
On the other hand our decision in Pence was correct in finding that Article 2315 imposes upon a bar owner a duty to avoid affirmative acts which increase the peril to an intoxicated patron. That duty is discussed by Presser in the following language: "There may be no duty to take care of a man who is ill or intoxicated, and unable to look out for himself; but it is another thing to eject *1283 him into the danger of a railroad yard; and if he is injured there will be liability." Presser, Law of Torts, § 56, p. 343. Accordingly it is not inappropriate as in Pence to find that a proprietor who closes his establishment and puts an intoxicated patron out on a busy highway breaches his duty not to increase his patron's peril.
Thus, in the absence of an affirmative act which increases the likelihood of the intoxicated person's harm to himself, the jurisprudence recognized no liability to the seller or server. With the passage of La. R.S. 9:2800.1, the legislature has provided as a general premise that "the consumption of intoxicating beverages, rather than the sale or serving or furnishing of such beverages, is the proximate cause of any injury ... inflicted by an intoxicated person."
Another setting where a duty for protection has been claimed involves a patron's security while on a business premises. In Harris v. Pizza Hut of Louisiana, Inc., 455 So.2d 1364 (La.1984), the supreme court affirmed a jury verdict for the plaintiff in a wrongful death action where a patron was killed in a robbery of a Pizza Hut. The court found that since the defendant had affirmatively acted in providing a security guard, the jury could reasonably conclude that the guard was negligent in carrying out his duties by failing to properly station himself in the building. In finding an assumed duty on the part of Pizza Hut, the court nevertheless stated that "[g]enerally, there is no duty to protect others from the criminal activities of third persons." Id. at 1371. Because the pronouncement of this general rule was arguably dicta, the courts of appeal have continued to struggle with whether a duty may arise and be placed on the nonfeasant business owner to act when there is an awareness of a pattern of injury-causing criminal conduct. See, Jacobs v. Parsons, Inc., 572 So.2d 360 (La.App. 1st Cir.1990).
In a last category of cases, the jurisprudential doctrine of attractive nuisance has been developed for the protection of children. As a general rule, the landowner who maintains a condition or instrumentality upon his premises that is dangerous to children of tender years because they are unable to appreciate the peril, may be held liable for their injury where there is a strong likelihood of an accident, the presence of children could reasonably be anticipated, and the landowner does not take reasonably prudent precautions for their protection under the circumstances. Fontenot v. Fontenot, 95-1483 (La.App. 3d Cir.5/15/96), 688 So.2d 1054. Nevertheless, the courts have not found that every instrument or condition by which a child might be injured is an attractive nuisance. As explained in Nguyen v. Crescent Land and Development Company, Inc., 527 So.2d 456 (La.App. 5th Cir.1988):
The reason for this rule is the tremendous burden placed on the property owner when the principle of attractive nuisance is held applicable. Moreover, the attractive nuisance rule is invoked only when the condition or agency causing injury is of such an unusual nature or character as to render it peculiarly attractive and alluring to children .... not every instrument possibly dangerous to a child of tender years, or which such a child might convert into a means of amusement, constitutes an attractive nuisance.
Id. at 458, quoting Patterson v. Recreation & Park Commission for the Parish of East Baton Rouge, 226 So.2d 211, 216 (La.App. 1st Cir.1969).
In reaching a conclusion regarding negligence, we must finally consider those cases where defendants have been held at fault despite the substantial fault of a plaintiff who acted with knowledge of the risk. The comparative fault regime of this state requires that the victim's careless disregard of the risk not be used to formulate the conclusion that the defendant is free from fault. Murray v. Ramada Inns, Inc., footnote 7, supra. In Cay v. State, Department of Transportation and Development, *1284 93-0887 (La.1/14/94), 631 So.2d 393, despite the decedent's intoxication, the DOTD's duty to build a bridge railing higher than the center of gravity of most pedestrians was held to encompass the risk that any pedestrian, whether impaired by alcohol or not, might accidently stumble and fall over the low railing. The foreseeable risks of danger to all pedestrians made it unreasonable for the DOTD not to guard against those risks by construction of a safe railing. The decedent was acting as a pedestrian at the time of the accident and his much greater fault did not erase the unreasonableness of DOTD's actions for the protection of pedestrian usage of the bridge.
In this case, our conclusion that Tech's construction of the Roof did not create an unreasonable risk of harm distinguishes this case from the Cay situation where the defendant's actions fell below a minimum safety standard resulting in the construction of a defective thing. Likewise, while the victim's actions in Cay may have substantially contributed to his death to the extent that the court assigned him 90% of the fault, his action in walking across the bridge nevertheless fell within the intended and expected use of the bridge. When the risk is created by the deliberate act of the victim aimed at challenging an obvious danger, the victim alone can be solely at fault. See, Cates v. Beauregard, footnote 3, supra.
Considering all of the above jurisprudence and, most significantly, the Fox ruling, we find that Tech's failure to act in these circumstances did not constitute negligence. The duty of Tech to provide a safe campus and not to act unreasonably with regard to its students did not extend to protect Trey from his deliberate act of recklessness in climbing the Roof. The Roof cannot be considered as an open and accessible part of the campus. Any prudent person would recognize the action of climbing the Roof both as an unreasonable danger to himself and as an unlawful physical invasion of property. Any damage caused to such an off-limits structure would amount to the intentional tort of trespass.
The plaintiffs' argument that the three prior instances gave rise to an affirmative duty to act is a miscalculated statistical focus. The Natatorium is located in an area of the campus where many thousands of students had passed by over the preceding seven-year period. Their presence, along with the presence of campus security, acted as the appropriate deterrent to such a blatant act, tantamount to an act of defacement of the property. The three prior acts, like any previous reckless acts on the campus by Tech students, intoxicated or otherwise, cannot be statistically isolated to serve in a formula for negligence in light of the non-custodial university/student relationship and the obvious danger of the Roof.
The same economic and social considerations that constrain the courts from imposing "Dram Shop" liability, liability for the criminal acts of third parties and liability for attractive nuisances also prevent us from announcing a rule of conduct which would require a university to protect against similar reckless acts of students abusing campus structures and causing danger to themselves and others. There are numerous other structures on any campus which might serve to lure a student into a late night lark with dangerous consequences. Just as the burden on L.S.U.'s resources to regulate student-sponsored campus activities was too onerous for the Fox court to impose, we do not place universities under an affirmative duty to fence off those campus structures which might serve as a dangerous platform for a reckless act.

Other State Entities
Our determination of no negligence by Tech despite its knowledge of the prior incidents also forecloses plaintiffs' claims against the State of Louisiana's Department of Planning and Control and the Louisiana Board of Trustees for State Colleges and Universities. Any oversight responsibilities of the State concerning Tech and the University of New Orleans does not create any separate basis for negligence regarding this accident.

*1285 Conclusion

The undisputed facts of this nonfeasance case left the trial court and this court to consider and weigh the social, moral, economic and other considerations for determining the extent of the duty of the university to act reasonably with regard to the risks of danger to its students. We decline to extend the duty to guard against the particular risk of falling from the Roof in this case. The trial court's determination that Louisiana Tech University was not negligent under these circumstances is affirmed. Costs of this appeal are assessed to appellants.
AFFIRMED.
BROWN, J., dissents with written reasons.

BROWN, J., Dissenting.
On April 5, 1991, Edward "Trey" Robertson, III, fell from the roof of a campus building at Louisiana Tech University. He died several days later from his injuries. Defendants filed a motion for summary judgment asserting a "no duty" argument which motion the trial court granted.
The purpose of summary judgment procedure is to pierce the pleadings and assess the proof to determine whether a trial is necessary. If there is no evidence upon which reasonable minds could differ, then trial would be a bootless exercise, fated for an inevitable result but at a continuing expense for the parties. Fontenot v. Upjohn, 780 F.2d 1190 (5th Cir.1986). If there is, however, a genuine question concerning a material fact or the inference to be afforded that fact, summary judgment is not proper. "[T]he judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202, 214 (1986).
Prior to Trey's tragic accident and death, seven Tech students attempted to *1286 climb the Natatorium roof. These previous incidents and Trey's fall all had certain things in common. All accidents occurred around midnight and involved campus sanctioned consumption of alcoholic beverages. In the first incident, the campus police report states that the two students who were found scaling the roof at 11:38 p.m. appeared to be intoxicated and had just left a DKE beer bust at the Student Center. Students leaving the Student Center would normally walk past the Natatorium on their way back to their dormitory. Alcohol was allowed at the Student Center which remained opened until midnight. This pattern was repeated in the next incident in which four students were observed on the Natatorium roof at approximately 12:47 a.m. One student fell and suffered a compound fracture of his vertebrae. At this point, Robert Dowling, the Director of the Natatorium, stated that "informal" discussions took place about the problem between Dowling, his boss, the Director of Recreation, and the campus engineer. They concluded "that there was nothing that could be done..."
Thereafter, the pattern was repeated when another student fell at 11:15 p.m. and sustained a broken wrist and compressed and fractured vertebrae. Following this incident, Dowling testified that renewed discussions concluded that because the students were intoxicated "it (preventative action) was not something that they deemed necessary" and that there was "really no answer" to the problem. Therefore, nothing was done by Tech to attempt to prevent further incidents or accidents.
Even after Trey's death, Tech officials continued to believe that nothing needed to be done; however, according to Robert Dowling, a few months after Trey's death, the Office of Risk Management in Baton Rouge ordered Tech to build a fence around the Natatorium. Dowling conceded that there have been no reports of students attempting to climb the Natatorium's roof since the erection of this fence. His deposition was taken in November 1997. At that time, the fence had been up for more than five years.
Traditionally there are five elements that a plaintiff must establish to prove his negligence claim: cause-in-fact; duty; breach of duty; legal or proximate cause; and, actual damages. Roberts v. Benoit, 605 So.2d 1032 (La.1991). This concept of negligence provides a common language to be used in the analytical process.
Louisiana enacted a comparative negligence statute which reduces a plaintiffs recovery by the degree of his own fault. The victim's own recklessness is an affirmative defense that must be shown by the defendant. We should be careful not to merge victim's fault into the elements of plaintiffs prima facie case of negligence. The existence of a duty should not be confused with either a breach of that duty or the victim's fault. Murray v. Ramada Inns, Inc., 521 So.2d 1123 (La.1988); Weaver v. Valley Elec. Membership Corp., 615 So.2d 1375 (La.App. 2d Cir.1993).
The trial court based its decision on the two-justice opinion of a divided supreme court in Pitre v. Louisiana Tech University, 95-1466 (La.05/10/96), 673 So.2d 585, U.S. cert. denied, 519 U.S. 1007, 117 S.Ct. 509, 136 L.Ed.2d 399 (1996). However, unlike the instant case, Pitre was decided only after a full trial on the merits. In fact, a summary judgment finding of "no duty" at an earlier stage of the Pitre litigation was reversed on appeal and the supreme court at that point denied the defendant's writ application. Pitre v. Louisiana Tech University, 604 So.2d 998 (La.1992).
In Pitre, a Tech student suffered serious injures when he struck a light pole while sledding down a campus hill following an unusual winter snow storm. The plurality opinion in Pitre was careful to avoid defining the defendant's initial duty in terms of the plaintiffs actual knowledge. Quoting from Murray v. Ramada Inns, supra, the court stated that a defendant's duty should not turn on a particular plaintiffs state of mind, but instead should be determined by *1287 the standard of care that the defendant owes to all potential plaintiffs, because to do otherwise would inject the assumption of the risk doctrine into the analysis "through the backdoor," and would result in a total bar to the plaintiff's recovery.[1]Pitre, 673 So.2d at 590.
Duty refers to relationships, i.e., whether Tech stands in such a position with its students as to create any legally recognized obligation of conduct for their benefit. Unless there is a broad no duty rule, one has a duty to avoid foreseeable injury to another. As stated in Pitre, supra, the law imposes on Tech such a duty.
Certainly the dangers or risks were clearly obvious to Trey Robertson. In light of the history, these midnight frolics at this particular site by students who had been drinking on campus at the Student Center were also clearly obvious to Tech. Tech officials discussed the problem on two separate occasions before Trey's tragic accident. After each conference, they decided that preventive measures were unnecessary. Even after Trey's death, Tech had to be ordered by its insurer to put up a fence.
In this case, the support beams slanted to the ground and were easily accessible. Trey Robertson's recklessness in walking up the beam sounds like victim fault. Yet, victim fault comes into play in the analysis only after a plaintiff has presented a prima facie case of negligence against a defendant.
As stated in Murray, supra, the old doctrines of assumption of risk and contributory negligence were subsumed into the comparative fault regime and are factors to be considered in assessing percentages of fault. These doctrines include an "open and obvious danger." See Weaver, supra at 1382, wherein this court stated:
After the adoption of comparative negligence, a plaintiff who negligently conducts himself in the face of even obvious and great danger from high voltage transmission lines is not barred from recovering from a transmitter whose negligent conduct is a cause-in-fact of that plaintiff's injury.
Otherwise in all cases of obvious and great danger, the courts would conclude that the plaintiff does not recover simply because of the obviousness and gravity of the risk to which he exposes himself. Under the comparative negligence regime, assumption of the risk does not survive in Louisiana as a distinct legal concept for any purpose. "[T]he courts, lawyers and litigants would best be served by no longer utilizing the term..." Murray v. Ramada Inns, Inc., 521 So.2d 1123 (La.1988).
In the instant case, the trial court allowed Trey's fault to "enter through the back door" and determined Tech's duty vel *1288 non. Tech's legal duty to correct an obvious danger is not excused by the victim's recklessness in undertaking an open and obvious risk. Rather, the victim's negligence reduces the amount of damages recoverable under comparative fault.
The majority sidesteps the trial court's finding of no duty and appears to base its opinion on a determination of "legal cause." Legal cause has nothing to do with cause or proximity. Rather, it refers to policy limitations. Legal cause raises the question of how far we should extend the consequences of an admitted breach of a duty. Hill v. Lundin & Associates, 260 La. 542, 256 So.2d 620 (1972); Roberts, supra; Weaver, supra. As eloquently stated by Professor Malone:
All rules of conduct, irrespective of whether they are the product of a legislature or are a part of the fabric of the court-made law of negligence, exist for purposes. They are designed to protect some persons under some circumstances against some risks. Seldom does a rule protect every victim against every risk that may befall him, merely because it is shown that the violation of the rule played a part in producing the injury. The task of defining the proper reach or thrust of a rule in its policy aspects is one that must be undertaken by the court in each case as it arises. How appropriate is the rule to the facts of this controversy? This is a question that the court cannot escape.
Wex S. Malone, Ruminations on Cause-in-fact, 9 Stan. L.Rev. 60, p. 73 (1956).
In Hill, supra, the defendant was a contractor tackling the problem of repairs in New Orleans after Hurricane Betsy. Because of the unusual number of repair jobs and their urgency, the contractor set up an assembly line process. As one set of repairmen completed their work, they moved to another job. In this case, they left a metal ladder leaning against the home to be picked up later by a company truck. At an unknown time, an unknown person, not an employee of the contractor, laid the ladder down in the yard. A few days later, Mrs. Hill, a domestic employee at the home, tripped over the ladder and was injured. In rejecting Mrs. Hill's claim, the supreme court stated that there was little or no ease of association between the rule (not to leave the ladder standing against the house) and what happened. Although cause-in-fact was shown (but for leaving the ladder against the house it could not have been laid down), legal cause asked whether as a matter of social policy we want to extend liability against the contractor for these particular consequences.
Legal cause is fact-specific, but, according to Professor Malone, is a decision for the judge. The Louisiana Supreme Court, however, has not been clear on who makes this decision. See Dennis, J., concurring, Kenney v. Cox, 95-0126 (La.03/30/95), 652 So.2d 992. "Duty" is a legal question distinct from "legal cause" which asks whether the duty should be extended to cover a particular set of facts. Because legal cause is fact specific and it is the trier of fact who decides why and to what extent a defendant is blameworthy, many courts have found that it is a decision for the trier of fact. See Weaver, supra.[2]
The law clearly imposes on Tech a duty to avoid foreseeable injury to its students. Pitre, supra. Should the scope of this duty extend to cover this particular risk, a student's midnight frolic? Unlike Pitre, this was not a one-time occurrence. It is undisputed that Tech had knowledge of a series of similar frolics and their potential for harm or danger. Previously, in separate incidents, two students had been seriously injured under almost identical circumstances; *1289 after each occurrence Tech officials discussed the problem and decided that no action was necessary. A reasonable person, and even more so a reasonable university, is required to realize that there will be a certain amount of reckless behavior by college students. In Levi v. Southwest Louisiana Elec. Membership Co-op., 542 So.2d 1081, 1086 (La.1989), the supreme court wrote:
... The power company complains that it should not be charged with recognition of any risk that takes effect through a victim's negligence. But the ordinary reasonable person, and even more so the power company, is required to realize that there will be a certain amount of negligence in the world. When the risk becomes serious, either because the threatened harm is great, or because there is an especial likelihood that it will occur, reasonable care may demand precautions against "that occasional negligence which is one of the ordinary incidents of human life and therefore to be anticipated." It is not due care to depend on the exercise of care by another when such reliance is accompanied by obvious danger. (emphasis added). (citations omitted).
. . .
The test for determining whether a risk apparent to one in the position of the actor is unreasonable is supplied by the following formula: The amount of precautions "demanded of a person by an occasion is the resultant of three factors: the likelihood that his conduct will injure others, taken with the seriousness of the injury if it happens, and balanced against the interest which he must sacrifice to avoid the risk." (citations omitted).
Under the particular circumstances of this case, the risk and the duty are easily associated. The risk was serious, the harm great, the likelihood of reoccurrence obvious and the cost or sacrifice to avoid further incidents small. There is no policy reason to limit the scope of the protection of the rule of conduct under these specific facts.
When defendants made their motion for summary judgment, plaintiffs were obliged to do more than show some metaphysical doubt as to material facts. Rather, plaintiffs were required to demonstrate that there were facts that could lead a rational juror to find for them. La. C.C.P. art. 966(C)(2).
In the instant case, Tech clearly had a duty to avoid foreseeable injury to its students. All these incidents took place around midnight, after students had been drinking, in some cases at the Student Center, and while they were returning to their dormitories. After two accidents involving serious injuries, Tech officials discussed the problem but took no action. Even after Trey's unfortunate death, Tech took no remedial action until ordered by the Office of Risk Management to erect a fence around the Natatorium.
The proper question to consider is whether there is any genuine issue of material fact concerning defendants' negligence. In the present posture of this case, reasonable minds could differ as to the inference of the evidence. Put another way, the pertinent question for summary judgment is whether rational minds could differ as to the reasonableness of defendants' conduct or inaction. Under the specifics of this case, reasonable minds could differ.
NOTES
[1] Tech is under the Board of Trustees of State Colleges and Universities, while UNO is part of the L.S.U. system. A fence surrounds the entire UNO complex including the parking area. Another fence surrounds the building. Both fences have gates that are kept open for students to access the facility. Unlike Tech, the UNO facility is not located where students routinely walk.
[2] In the rulings of this court in Pitre, prior to the supreme court's final decision, this court first reversed the trial court's summary judgment in favor of Tech without identifying a material fact dispute for further resolution by the trial court. Pitre v. Louisiana Tech University, 596 So.2d 1324 (La.App. 2d Cir.1992). Then, upon the second appellate review by this court, the court again reversed the trial court upon a ruling that our original decision established the law of the case on the issue of duty. Pitre v. Louisiana Tech University, 26,388 (La.App.2d Cir.5/10/95), 655 So.2d 659.
[3] Cf., Fox, supra, where the supreme court affirmed a summary judgment dismissing the defendant university which allegedly failed to act to insure the safety of students on its campus and Cates v. Beauregard Electric Coop., Inc., 328 So.2d 367 (La.1976), where summary judgment was affirmed upon the apparent conclusion that the defendant's duty did not extend to cover the unusual and reckless act of a sixteen-year-old.
[4] Loescher v. Parr, 324 So.2d 441 (La.1976).
[5] Entrevia v. Hood, supra.
[6] Landry v. State, 495 So.2d 1284 (La.1986).
[7] Murray v. Ramada Inns, Inc., 521 So.2d 1123 (La.1988).
[8] Socorro v. City of New Orleans, 579 So.2d 931 (La.1991).
[1] Ultimately, the two-justice opinion concluded that the likelihood of harm was minimal because the light pole was obvious and apparent to those sledding on the hill that evening and the associated risks were well known. The court further found that the cost of prevention would have been great and concluded that the condition of the premises was not unreasonably dangerous and that Tech owed "no duty" to the plaintiff.

Three of the seven justices participating in the Pitre case concurred in the result, but found that the pivotal issue in the analysis was not the existence of a duty, but the breach of a duty. The concurring opinion stated that a "no duty" defense generally applies when there is a rule excluding liability as to whole categories of claimants or claims under any circumstances, whereas in the usual case in which the duty owed depends on the circumstances of the particular case, the analysis of the defendant's conduct should be done in terms of "no liability" or "no breach of duty." The concurring opinion concluded that while Tech had a duty to act reasonably in view of foreseeable risks of danger to students resulting from the winter storm, Tech acted reasonably under the circumstances. Pitre, 673 So.2d at 596.
Finally, in Pitre, two justices dissented. The dissenting opinion stated that the plaintiff's negligence did not eliminate the university's duty to warn against sledding at the dangerous site and concluded that the court of appeal was correct in assigning comparative fault figures to the plaintiff and the university. Pitre, supra at 597.
[2] Justice Victory, who authored the plurality opinion in Pitre, dissented in Weaver, supra at 1390, stating:

Legal cause is an issue of mixed fact and law or policy. Whether or not a party's negligence is a legal cause of an injury is a question for the trier of fact and should not be disturbed unless the issue is so clear that reasonable persons could not differ.