795 So.2d 1239 (2001)
Jamie Eric ALBRITTON, Plaintiff-Appellee,
v.
Brad WOODS and Donald Robinson, d/b/a The Honky Tonk II, Defendant-Appellant.
No. 34,073-CA.
Court of Appeal of Louisiana, Second Circuit.
September 28, 2001.
Noah, Smith & Newman By Todd G. Newman, Monroe, Counsel for Appellant.
Brad Woods, In Proper Person.
Geary S. Aycock, West Monroe, Counsel for Appellee.
Before BROWN, GASKINS and DREW, JJ.
DREW, J.
Donald Joe Robinson appealed a judgment in favor of plaintiff Jamie Albritton who sued Robinson and Brad Woods for injuries Albritton sustained in a fight on a parking lot leased by Robinson's Ruston business, the Honky Tonk II. For the following reasons, the judgment is reversed insofar as Donald Joe Robinson was found liable for plaintiff's damages.

FACTS
On the evening of September 27, 1996, 20-year-old Jamie Albritton and his friend Kevin Willis went to a Ruston bar known as the Honky Tonk, II. Albritton parked his car in a parking lot adjacent to the bar. Over the course of several hours, Albritton had two or three beers, played pool and visited with his friends.
Inside the Honky Tonk, Albritton met an acquaintance, Brad Woods, who neither appeared at the trial to testify nor was he *1240 deposed. Albritton talked to Woods about a fistfight approximately a week earlier involving one of Woods' friends. Albritton testified that Woods believed that one of Albritton's friends, Cassidy Rollie, had injured Woods' friend. Woods informed Albritton that Woods was going to find Rollie and injure him in retaliation. Albritton told Woods he had spoken with Rollie and learned Rollie had not fought with Woods' friend. Albritton said that he and Woods then "went about our ways."
Some time later, Albritton and Willis left the Honky Tonk. As they went through the door into the parking lot, they encountered Woods who was speaking with the Honky Tonk bouncer, William "Saint" Barnett. Albritton and Willis testified that Woods became very agitated when he saw Albritton, cursed him and threatened to "beat up" both Albritton and Willis. Woods made these threats in front of Barnett, and according to Albritton, Barnett said:
Y'all not going to fight here, y'all can go somewhere else. You can go across the road.
Albritton testified that he said that he "wasn't fighting, period."
Sean Oglesby, another Honky Tonk bouncer, saw the incident and testified that he was not working security that night but was there on his free time. He said that at this point, Barnett came back inside the bar and it appeared that the incident was over. According to Oglesby, Woods again became confrontational with Albritton and said that "he was going to take care of it" before Woods walked across the street. Oglesby stated that he then asked a patron to go and get Barnett. Oglesby testified that when Barnett returned, Oglesby told Barnett that he (Oglesby) thought that the incident was over and that Woods was going to leave. Oglesby said that he repeatedly told Albritton not to go across the street and that if he did go across, "Brad's going to jump on you." Oglesby testified that Woods had been the aggressor in several prior altercations at the Honky Tonk.
The parties stipulated to the introduction into evidence of the deposition testimony of Darrell Oliveaux, another security officer at the Honky Tonk, who was with Oglesby. At first Oliveaux was unsure whether he was working that night. Later Oliveaux stated that he was not working. Oliveaux said:
Q: Now, when you and Mr. Oglesby stepped outside the front door of the Honky Tonk and told Brad and Jamie to break it up, what happened then? What did Brad do and what did Jamie do?
A: Well, they both more or less stopped. I mean, the argument calmed down a little bit, and then Brad announced that he was going to go across the street and wanted Jamie to come over there.
Q: And what did Jamie do?
A: Jamie hung around for a little while. Brad got across the street, and then Jamie started going over there, at which timeand I said something to him and Mr. Oglesby said something to him, as well. I don't recall who said first, but both of us at some point said, you know, "Don't go over there; if you go over there, you know, you're going to end up in a fight with Brad." And
Q: What did JamieDid Jamie say anything back to you?
A: Jamie simply said back to us, he said, "No, I'm not going to fight; we're not going to fight; I'm going to go over there and talk to him." And one of us reiterated again, "No, if you go over there, you're going to have to fight Brad." And we don't go across the street *1241 as a general policy because the police have told us not to.
Albritton testified on direct examination:
Q: Did Mr. Woods walk across the street?
A: Yes, he did.
Q: Did Mr. Woods indicate to you whether or not he wanted you to come across the street?
A: Yes, he did. He said let's come across the street and let's talk.
Q: At that point was Mr. Woods still threatening to (sic) injury you?
A: Not at that exact point, no.
Q: Do you know where Mr. Barnett, the security, went when youwell, when Mr. Woods walked across the street?
A: He wasI guess he was still outside, I'm not for sure, because I was walking away across the street.
Court: Let me ask a question at this point. Why were you walking across the street to talk to him when you could have easily talked to him right there where you were?
A: Because they toldbecause the security there said y'all have to leave, go across the street or go somewhere else, and I thought if I would go somewhere else he would follow me and basically kick my tail end.
On cross-examination, Albritton testified:
Q: So Brad Woods was acting as if he wanted to fight right there in front of the Honky Tonk?
A: Yes.
Q: And despite this you went ahead, fully cognitive of what you were doing, and walked across the street to what you say talk with Brad Woods?
A: After he said let's go across the street and let's talk, because I've known Brad for about four years prior to this and
Q: What sort of state did he appear to be in at that time?
A: At the time he said let's go across the street and talk he had done calmed down a little bit.
. . .
Q: Now is your statementdespite all this that we've just been through is it your statement that with two to three beers in you over the course of three or four hours and standing outside the Honky Tonk, that despite all this you really didn't think that you and Brad were going to get into a fight across the street?
A: No, I didn't.
Willis asked Albritton not to go across the street, but Albritton decided to go anyway. Willis and Albritton both then went across the street to the parking lot where Woods stood. Willis testified that Albritton and Woods went across the street together, while Albritton testified that he followed Woods across the street.
One parking lot across the street was owned by a medical supply company to which Robinson paid $100 per month so Honky Tonk patrons could use the parking lot. Albritton said that he had seen Honky Tonk security officers in this parking lot before, but there were no officers there that night. Subsequent to this incident, Willis became a Monroe city police officer; he testified that he sometimes works off-duty as a security officer at the Honky Tonk and that as part of his duties he works in this parking lot where the fight occurred.
Albritton testified that when he and Willis approached Woods in the parking lot, Woods again began threatening them. Albritton said that he then turned to walk away when Woods hit him. Woods hit Albritton again, and Albritton stated that he had to fight Woods to defend himself. Woods hit Albritton in the nose, stunning him, pushed him down and kicked Albritton repeatedly in the face. Oglesby came *1242 across the street and stopped the fight by pulling Woods off Albritton. Albritton testified without objection that after the fight he saw Robinson and Barnett talking in this area and that Robinson was telling Barnett that he should have stopped the fight.
Albritton went to the emergency room at a local hospital where he was treated for broken teeth, a broken eardrum, a broken nose, blackened eyes, a broken lip and wrist pain. Subsequently, Albritton saw various doctors including his general practitioner, an orthopedist, an ophthalmologist and a dentist. His wrist required a cast for about a month and a splint for another three weeks. At trial, Albritton complained of sinus troubles and related that his doctor told him that his sinuses would never be the same. He further stated that his injured wrist had a limited range of motion and reduced strength.
On June 4, 1997, Albritton filed suit against Woods and Robinson d/b/a Honky Tonk II. The case was tried before the judge on August 26, 1999. After hearing all of this evidence, the trial court found Woods 100% liable for Albritton's damages as an intentional tortfeasor. The court further found that Albritton was 50% at fault and finally held Robinson 30% at fault. However, the court's judgment, signed September 23, 1999, further stated "It is the intent of this Court that the plaintiff, JAMIE ALBRITTON, be entitled to recover therefore 15% of the total award from the defendant, DONALD ROBINSON, DBA THE HONKY TONK." Robinson thereafter filed a motion for new trial challenging the apportionment of fault, and the court denied this motion on November 29, 1999.
On January 25, 2000, Robinson took a devolutive appeal. No other party appealed. The record was lodged in this court on May 15, 2000. On June 16, 2000, Robinson filed a petition for bankruptcy and the appeal was automatically stayed. Robinson's bankruptcy case was dismissed on August 4, 2000. This court received notice of the lifting of the automatic stay on February 28, 2001, and on April 16, 2001, this court dissolved its stay and ordered that this appeal proceed.

DISCUSSION
On appeal, Robinson first argued that he either owed no duty or breached no duty to Albritton. Second, he urged that the trial court's allocation of fault was in error.
Although there was a question at trial whether this assault occurred on the parking lot leased by Robinson or on an adjacent lot owned by the state, Robinson has not urged on appeal that the assault was on state property not leased by him. Compare Bezet v. Original Library Joe's, Inc., 98-1467 (La.App. 1st Cir.6/25/99), 747 So.2d 77, writ denied, 99-2836 (La.12/17/99), 751 So.2d 879.
Whether a duty exists in a particular set of circumstances is a question of law for the court to decide. Carroll v. State Farm Fire & Cas. Co., 31,652 (La. App.2d Cir.5/5/99), 732 So.2d 1263, 1266. In Posecai v. Wal-Mart Stores, Inc., 99-1222 (La.11/30/99), 752 So.2d 762, the supreme court held:
We now join other states in adopting the rule that although business owners are not the insurers of their patrons' safety, they do have a duty to implement reasonable measures to protect their patrons from criminal acts when those acts are foreseeable. We emphasize, however, that there is generally no duty to protect others from the criminal activities of third persons. This duty only arises under limited circumstances, when the criminal act in question was reasonably foreseeable to the owner of the business. Determining when a *1243 crime is foreseeable is therefore a critical inquiry. (Citation omitted.)
In the context of the duty to protect patrons from random criminal activity, the court adopted a balancing test to determine what level of security a business must provide for its patrons:
The foreseeability of the crime risk on the defendant's property and the gravity of the risk determine the existence and the extent of the defendant's duty. The greater the foreseeability and gravity of the harm, the greater the duty of care that will be imposed on the business.
In Harris v. Pizza Hut of Louisiana, Inc., 455 So.2d 1364, 1371-1372 (La.1984), the supreme court decided that Pizza Hut was liable for damages to patrons caused by an inattentive guard surprised by armed robbers. The court explained the duty to protect against criminal activity in the context of that case:
[W]hen a duty to protect others against such criminal misconduct has been assumed, liability may be created by a negligent breach of that duty.... The Pizza Hut had already accepted the duty of hiring a security guard on the date of the shooting between the hours of 9:00 and 1:00 A.M. Once employed, the security guard was under a duty to discharge his obligations in a reasonable and prudent manner, and especially not to contribute by his act or omission to an escalation of violence during an armed robbery which resulted in patrons being wounded and killed.
The criminal conduct in this case is not an attack by a stranger on a patron; rather, the attack was by a frequent patron and known troublemaker upon another frequent patron. Further, the evidence reflects that Honky Tonk security officer William Barnett was aware that these two patrons had at one point engaged in a heated argument earlier the same evening.
In this case, the trial court stated:
Further, I find the defendant Robinson responsible to a degree because from the testimony that was adduced in court today and the deposition of Mr. Oliveaux, the Honky Tonk, defendant, took some responsibility and had knowledge that there was some dispute going on and involving the parties herein. In fact they were aware (sic) and that the fight was imminent. Their way of trying to get rid of this thing was "go across the street, leave our property." They already knew there was going to be a fight and I think there was a duty of the owner of the bar to make sure that they be provided some safety, put him in the car, let him go his way, make sure the other guy doesn't confrontcontinue to confront. Mr. Oglesby clearly said that it looked like they were going to still be at each (sic) other throat, that it wasn't resolved when they left the premises.
The comparative fault regime of this state requires that the victim's careless disregard of the risk not be used to formulate the conclusion that the defendant is free from fault. Robertson v. State ex rel. Department of Planning and Control, 32,309 (La.App.2d Cir.12/10/99), 747 So.2d 1276, 1283, writ denied, 00-0041 (La.2/25/00), 755 So.2d 882. However, as this court stated in Eason v. Finch, 32,157 (La. App.2d Cir.8/18/99), 738 So.2d 1205, 1209, writ denied, 99-2767 (La.12/10/99), 751 So.2d 861:
Only when the owner, management or employees of a business have or should have knowledge of a third person's intended injurious conduct that is about to occur and which is within the power of the owner, management or employees to protect against, does the duty arise.
Because the Honky Tonk, through Barnett, knew that Woods was a troublemaker *1244 who had threatened Albritton with violence, the Honky Tonk had a duty to take those actions within its power to prevent an altercation.
However, under these particular facts, the bar's duty did not extend to protecting Albritton from the consequences of his own decision to continue the encounter with Woods after the dispute appeared to be over. Oglesby testified that from the exchange between Woods and Albritton outside the Honky Tonk door, it appeared that the incident was over when Woods went across the street. Oglesby said that he told Barnett that the incident appeared to be over before Barnett returned inside the bar. Most telling is Albritton's own testimony that he believed that he was just going to talk to Woods when he went across the street. The bar satisfied its duty to Albritton when the security guard remained until it appeared that the encounter was terminated.
Under these circumstances, we hold that the Honky Tonk owed no further duty to Albritton, and in particular owed no duty to restrain Albritton from crossing the street to continue the encounter. Witnesses, even Albritton himself, believed that the confrontation was over. The bar's security officer was present during the previously heated portion of the argument when Albritton was not harmed. Albritton himself chose to reengage Woods after this point, if only verbally, and absent evidence that Albritton was incapable of controlling his own actions due to some act of the bar, the bar owed no duty to prevent this further contact.

CONCLUSION
The decision of the district court holding Donald Joe Robinson d/b/a Honky Tonk II partially responsible for Jamie Albritton's injuries is reversed and judgment is entered dismissing Jamie Albritton's claims against Robinson. In all other respects, the judgment is affirmed. Costs of this appeal are assessed against Jamie Albritton.
REVERSED IN PART.